(No. 23162.—

*In re* L. P. HARRISS, Attorney, Respondent.

*Opinion filed October 14, 1936.*

CAIRO A. TRIMBLE, *amicus curiæ.*

MOSES PULVERMAN, and M. C. COOK, for respondent.

Mr. JUSTICE SHAW delivered the opinion of the court:

At the time of the various transactions herein referred to, the respondent, L. P. Harriss, was, and still is, judge of the city court of DuQuoin, Illinois. This disciplinary pro-

ceeding by the Illinois State Bar Association arises out of a complaint made by Joseph P. Burke, a State parole agent, and concerns respondent's relations with Helen Jackson, a prisoner in the Women's State Reformatory at Dwight. Since there is no substantial dispute as to the facts, it will be unnecessary to refer in detail to the testimony of the various witnesses. The evidence was heard before commissioners, who reported to this court, with a recommendation that the respondent be suspended from practice.

At the October, 1929, term of the city court of Du-Quoin, Helen Jackson was arraigned before the respondent, as judge of that court, on an indictment which charged her with the murder of another colored woman. She was not represented by counsel, persisted in a plea of guilty after being advised and admonished as to her rights and the consequences of her plea, and was thereupon sentenced by the respondent to a term of thirty-five years' imprisonment. After she had been sentenced, and before being removed to prison, she requested that the respondent go with her and the deputy sheriff to Joliet, which he did. She was transferred to Dwight on November 29, 1932. About this time, or a little later, the respondent wrote to the superintendent at Dwight, in substance, that since he had sentenced Helen Jackson he had become aware of a set of circumstances which convinced him that the prisoner was not able to enter a plea of guilty at the time she did, and was in all probability so deranged at the time she killed the other woman that she did not realize what she was doing. There was some further correspondence and some intervening events. Among other things, Helen Jackson's husband died, apparently leaving a small estate and some life insurance. The respondent undertook to straighten these matters out for the prisoner and went to Dwight to see her. Without unnecessary detail, it is sufficient to state that the matter was consummated by Helen Jackson transferring the

sum of $200 to the respondent. She appears to have considered this as a fee to pay the respondent for appearing before the parole board and trying to obtain a pardon for her. The respondent testified that no fee at all was involved; that it was his intention and expectation to give his services without reward and the $200 to be entirely used for traveling and other expenses and for the hiring of alienists to testify as to Helen Jackson's mental condition. After the $200 was paid, the husband of the murdered woman, who was to be one of the respondent's witnesses, became insane, and one of the doctors upon whom the respondent was relying died. Several months elapsed without, apparently, anything being done, except that the respondent did make one appearance before the parole board at Chester. It was his testimony that he asked the opinion of the members of the board as to the propriety of his appearing before them under the circumstances, and that they assured him it would be entirely proper. No petition was ever filed or appearance entered, and after the filing of the complaint herein the $200 was returned.

There is considerable evidence to indicate that some part of the $200 paid by Helen Jackson to the respondent was paid and accepted as a fee. Thus, under date of May 10, 1933, the respondent wrote to her, saying, among other things: "I received your letter with the voucher for $200 in the same, which sum was to pay for my appearance before the parole board of Illinois." Other documents in evidence are signed by others than the respondent and are not necessarily binding upon him. As against this, we have the respondent's testimony that he was thoroughly convinced he had committed an injustice when he sentenced the defendant; that he was sincerely anxious to right the wrong he thought he had done; that he told her he would take nothing more than enough to cover expenses, and that he expected the actual expenses for psychiatrists, traveling, publication of notice, etc., to require the whole sum of $200.

The respondent introduced the testimony of a large number of responsible citizens who sustained his general reputation for honesty and integrity in the practice of law and as a judge. Among these character witnesses was a former president of the Illinois State Bar Association, a county judge and two circuit court judges.

On the whole record we do not find that respondent is blameless in the transaction. On the contrary, we believe his conduct to have been such as to be well calculated to bring the legal profession and the judiciary into disrepute and to be deserving of our strictest censure and condemnation. Stating it as mildly as possible, it is extremely dangerous, and peculiarly subject to misinterpretation and misunderstanding, for a judge to take money from anyone, and when such a transaction occurs in connection with a subject matter which arose in the judge's own court it is definitely contrary to judicial ethics. If the respondent thought he had committed an injustice it would have been entirely proper for him to legitimately do anything within his proper sphere, through other attorneys and other agencies, to right the wrong. , To attempt to do it himself and to receive money in connection with the transaction was to invite exactly what happened—a definite discredit to himself and an equally definite stain upon the entire judiciary. The bar association in its brief quotes several of the canons of judicial ethics as adopted by the American Bar Association referring to the conduct of judges. These were all succinctly summed up by St. Paul centuries ago when he advised the Thessalonians to abstain from all appearance of evil. This simple but essential injunction has been disregarded by the respondent, and for his conduct he is censured.

*Respondent censured.*