(No. 26113.—
In re Eugene L. McGarry, Attorney, Respondent.

*Opinion filed September 25, 1942.*

STONE, C. J., dissenting.

CHARLES LEVITON, *amicus curiae.*

WM. SCOTT STEWART, for respondent.

Mr. JUSTICE GUNN delivered the opinion of the court:

The Board of Managers of the Chicago Bar Association as commissioners of this court filed a report recommending Eugene L. McGarry be disbarred and his name stricken from the roll of attorneys of this court. The respondent filed exceptions to said report and the cause is now before us. This proceeding and report involved the respondent's

conduct in connection with the approval of bail bonds while acting as judge of the municipal court of Chicago. All of the matters complained of relate to his approval of bonds on which either Harold Gendon or Francesco Bracciaventi was surety. Over a period of a number of years respondent had approved some sixty odd bonds purported to be signed by Gendon, and thirty-five on which Bracciaventi was surety. The evidence shows these men became sureties at the request of Samuel Brin, who for many years had made a practice of procuring bondsmen for those charged with criminal offenses.

Brin would charge a fee for furnishing a bond and would give part of this money to the surety. Brin had obtained bonds for clients of respondent McGarry before he was elected judge of the municipal court. Brin was a precinct captain of a political party and was interested in a tavern, but his financial condition is not shown. Gendon and Bracciaventi were both shown to be financially irresponsible. Gendon had title to a tract of real estate which Brin had caused to be conveyed to him in order that he might become a surety on bail bonds. This property was a vacant lot which, when the mortgage upon it is taken into consideration, was possibly worth $200. Respondent testified Gendon told him he had been offered $5000 for it by an oil company for use as a filling station and that he thought it was worth more. Bracciaventi had no property and during most of the time involved was on relief. He owned some real estate but the improvements were removed during the latter part of the period involved and it was scheduled on the bonds as vacant property. It was of substantially no value. The proof shows respondent made no inquiry about the financial condition of either Gendon or Bracciaventi, who were always accompanied by Brin when they presented bail bonds upon which either of them was surety.

Respondent testified Gendon was always present or in the vicinity of the court room when he approved the bonds.

This statement is claimed to be untrue, because it appears Gendon's signature was forged upon eight of the bonds, raising the implication the acknowledgments upon such bonds must have been made when Gendon was not present. Circumstances are also in evidence which indicate the respondent acknowledged one of the bonds in blank before the name of the defendant or the crime with which he was charged were written in, since it appears he was in Hot Springs, Arkansas, on the date of the defendant's arrest. The evidence surrounding this transaction is somewhat confused, as the bond is dated in March, 1938, and the arrest occurred in March, 1939, but assuming the date was erroneous the respondent was in Hot Springs in March, 1939, when the bond was purported to have been approved.

Rule No. 9 of the municipal court of Chicago provides in part "it shall be the duty of a judge before approving any recognizance or bond upon which real estate is scheduled (excepting upon Sundays, holidays and Saturday afternoons between 12 o'clock M. and 8 o'clock P. M.) to cause inquiry to be made of a deputy clerk, assigned to such duty, respecting the condition of the title and the value of the real estate scheduled." This rule was not complied with in regard to any of the bonds signed by Gendon or Bracciaventi. Many of the other municipal judges testified they considered the rule advisory only, and that they had at times failed to follow it. Respondent disregarded the rule more frequently than any of the other judges. A compilation of the approval of bonds by municipal judges covering a full period from 1934 to 1939, inclusive, discloses seventeen of the judges had approved unscheduled bonds on numerous occasions. The total number by respondent for such period was 398; other judges 144, 190, 102 and 151, respectively; the others much less frequently. Fifty municipal judges are shown to have occasionally disregarded the rule. There is nothing in the record to show whether respondent had before him a correspondingly

greater number of cases. However, the evidence does show the rule was habitually disregarded by most if not all of the judges. The record also discloses of the bonds approved by respondent without compliance with the rule one was forfeited, and that of the other bonds approved in accordance with the rule seven were forfeited.

The substance of the complaint is that a judge should act in good faith, and that in the proper exercise of his *judicial duties* the financial responsibility of Gendon and Bracciaventi could and should have been known, and that respondent's conduct tended to bring the bar and the judiciary into ill repute and to obstruct justice, and that there was a conspiracy between the respondent, Brin, Gendon and Bracciaventi to do illegal acts, and to permit persons to be released from custody without giving proper bail, and that such actions constituted a conspiracy to permit Brin, Gendon and Bracciaventi to derive compensation by executing and filing worthless bail bonds. There is a supplemental charge the respondent disregarded the rules of the municipal court and the statute of the State of Illinois relating to professional bondsmen in that Gendon had at no time been licensed as a professional bondsman.

A motion to quash was made by respondent based upon the claim all of the matters contained in the complaint referred to activities in his judicial office, and that the only tribunal having jurisdiction to act upon the same was the legislature by way of impeachment. Respondent filed an answer denying the charges of the complaint, and further set out all of the acts described in the complaint were performed by him as a judge and acting in the exercise of his judicial discretion, and denying there was any conspiracy or anything done by respondent to bring the judiciary into ill repute.

The relator takes the general position that any acts committed by respondent whether acting as a judge or otherwise, which would be sufficient ground for the strik-

ing of the name of a practicing attorney from the rolls is ground likewise for striking from such roll the name of the respondent, even though he be acting as a judge. The respondent takes the position that all of the acts charged were such as came within his discretion as a judicial officer to determine, and that (1) as a matter of policy the actions of a judge in his judicial capacity cannot be the basis of a disbarment proceeding; (2) the proceeding amounts to one removing a judge from office by taking from him his license to practice law necessary to hold office; and (3) there is no proof of showing moral turpitude or a wilful and intentional violation of any law.

The findings of the commissioners are general, but their substance is that the respondent by his reliance upon Brin shows he regarded the approval of bonds and schedules as a mere formality upon the part of the court, and that he lent himself to the illicit bond business of Brin and others, and that his actions indicate slackness and abuse of discretion in his judicial duties, and such a malfeasance in the administration of those duties as would amount to moral turpitude; and that respondent's arrangements and transactions between Brin, Gendon and Bracciaventi constituted a conspiracy to do illegal acts to obstruct the course of justice and to permit persons to be released from custody without compliance with the law relating to the giving of bail, and that said actions constitute a conspiracy to permit such persons to derive profit by executing worthless bonds.

Both the complaint and findings are in fact based upon actions in exercise of the respondent's judicial duties. The first matter, therefore, to which it is necessary to direct our attention is the extent, if any, to which a lawyer who is performing judicial duties as a judge of a court of record is amenable to discipline under the rules of this court. All of the matters complained of arise out of the actions of respondent as a judge of the municipal court in fixing and approving bail bonds of persons accused of crime brought

before him. The constitution provides all persons shall be bailable by sufficient sureties except for capital offenses, where the proof is evident or the presumption great, etc. (Const. of 1870, art. II, sec. 7.) This section contemplates the admission to reasonable bail of all persons charged with a criminal offense, except for a capital offense, where the presumption is great or the proof is evident. (*People ex rel. Smith* v. *Blaylock,* 357 Ill. 23.) Bail is not allowed or refused on account of the presumed guilt or innocence of the person accused, though the existence of a doubt as to his guilt and the probability of his appearance are proper matters for consideration in determining the amount of bail, and likewise the character and criminal record of the person accused are proper matters to be considered in fixing it. *People ex rel. Sammons* v. *Snow,* 340 Ill. 464.

Official action is judicial where it is the result of judgment or discretion. When the officer has the authority to hear and determine the rights of persons or property, or the propriety of doing an act, he is vested with judicial power. An officer will be regarded as being clothed with judicial or quasi-judicial functions, when the powers confided to him are so far discretionary that he can exercise or withhold them according to his own judgment as to what is necessary and proper. (*People* v. *Bartels,* 138 Ill. 322.) The action of a municipal judge in admitting a person to bail is clearly a judicial act. (*Solomon* v. *People,* 15 Ill. 291, 79 Am. Dec. 473.) In the performance of his judicial acts it has been uniformly held that no action can be maintained against a judge for errors of judgment committed in the execution thereof. This principle is said to be as old as the common law. It rests upon consideration of public policy, its purpose being to preserve the integrity and independence of the judiciary, and to insure the judges will act on their own free, unbiased convictions, uninfluenced by any apprehension of consequences. (30 Am. Jur. 756; *People ex rel. Chicago Bar Ass'n* v. *Standidge,* 333

Ill. 361.) In this case we said, "It is of the greatest importance to the welfare of the people that for acts within his jurisdiction the judge should be immune from attack in a civil proceeding. It is his duty to hear and decide cases that involve not only property, but even liberty and life itself. His decisions not infrequently incite a feeling of bitterness and the defeated litigant readily ascribes improper motives to the judge. If under such circumstances that officer may be harrassed by a civil suit, judicial independence, which is essential to the rights and liberty of the citizen, will be swept away." In *Bradley* v. *Fisher,* 80 U. S. 335, 20 L. ed. 646, it is said: "For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to everyone who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful." The principles referred to have usually been applied in actions for damages against judges because of acts in excess of jurisdiction, or because of wanton and malicious exercise of acts within their jurisdiction.

It is contended, however, that this principle has no application to proceedings to disbar a lawyer for actions performed by him as a judge, and respondent takes the extreme position that because he is a judge no complaint of any sort may be maintained. From an examination of authorities and the application of general principles we are convinced that the rule is neither so broad as to be a complete exemption from responsibility, nor do we believe that disciplinary measures may be exercised against a judge without regard to whether the acts complained of are judicial or extrajudicial. No case has been called to our attention in which the judge has been disbarred because

of improper exercise of judicial power while acting in a judicial capacity. In the case of *In re Harriss*, 364 Ill. 290, a city judge was censured upon an application for disbarment because of acts he performed entirely outside of his judicial duties. In the case of *In re Holland*, 377 Ill. 346, the matter complained of was refusal of a judge to testify before a grand jury concerning activities outside of the performance of any judicial duty. Substantially all of the cases cited where jurisdiction to hear or disbar was taken involve actions of a judge that were not committed in the performance of a judicial act. Thus, *In re Craig*, 82 Pac. (2d) 442, was the case of a judge of a State court who had been convicted of a crime in the United States courts, and after his resignation as judge a disbarment proceeding was entered against him. No effect whatever was given to the fact he was a judge at the time the criminal offense was committed. In the case of *In re Spriggs*, 284 Pac. 521, 36 Ariz. 262, the judge knowingly caused a false record to be made, showing the renewal of a judgment in favor of a former client. In *In re Stolen*, 214 N. W. 379, 193 Wis. 602, the judge borrowed money from criminals who were appearing before him charged with crime. In the case of *In re Williams*, 128 S. W. (2d) 1098, a probate judge borrowed sums of money from estates pending in his court, and kept for his own use inheritance taxes due the State, and while acting as sheriff attempted to influence jurors and kept commissions and took rewards for stolen property. In the case of *Johnson* v. *Goddard*, 18 Pac. 338, 11 Colo. 259, the proceeding was not based upon a judicial act but upon promises to appoint a person as a clerk, while running for election. In the case of *In re Hobbs*, 75 N. H. 285, 73 Atl. 303, a lawyer was acting as justice of the peace. As such justice he converted to his own use bail money. He arraigned defendants upon complaints issued against other persons, and was guilty of imposing fines without any process whatsoever. In the case of *State* v.

*Peck,* 88 Conn. 447, 91 Atl. 274, a probate judge collected from an estate in which he was acting as judge $750 as a pretended fee by requiring the attorneys for the estate to agree to its allowance as a condition of their getting any compensation. The opinion holds he was acting as a lawyer and not as a judge, and such actions showed moral unfitness. In the case of *In re Burton,* 67 Utah, 118, 246 Pac. 188, the judge had a personal quarrel with attorneys trying a case before him and denied them a change of venue. He likewise disbarred them and wrote letters to himself purporting to be signed by other persons, justifying his acts, and otherwise conducted himself in a highly arbitrary manner. This case also involved his actions as county attorney. The court held the action in writing letters was not in any sense judicial or in the exercise of judicial functions, and in reaching its conclusion to reprimand the respondent said: "In this proceeding we have attempted to and have divorced the exercise and performance of mere judicial functions of the accused, as the court or the judge thereof, from extraneous acts or conduct of the accused, and have referred to the former only as they furnish a basis or circumstance or inducement of the latter."

In all of these cases it is perceived that the respondent while in fact a judge did not act judicially but committed offenses entirely outside of his judicial duties and the order of disbarment when entered was because of such outside activities. The distinction seems to be that an attorney at law, even though he be a judge may be disciplined if, as said in *In re Stolen, supra,* the general conduct of the accused showed a lack of morality. "One may lack morality in a great many ways. Where this lack of morality has no relation to, and does not affect, his duties and responsibilities as an attorney at law, the delinquencies are generally overlooked by the courts. But where there is lacking honesty, probity, integrity and fidelity to trust reposed in him, it matters not whether the lack of such virtues

is revealed in transactions with clients, in the conduct of lawsuits, or any other business dealings or relations. These qualities are highly essential on the part of those who are to exercise the privileges and responsibilities of members of the bar." In the case of *In re Gibbs,* 214 N. W. 850, 51 S. D. 464, the court said: "We are not willing to hold, and do not hold, that this court is deprived of the power to disbar an attorney licensed to practice in this State merely by reason of the fact that such attorney has become a judge, and that the misconduct complained of was in his judicial capacity, although upon this question there is some conflict of authorities. * * * We are of the opinion as a matter of general public policy that, in the absence of some extraordinary or unusual situation, the removal of a judge in this State should be accomplished, if such removal becomes necessary, in the manner specifically and affirmatively provided therefor by the law of this State, and not through the roundabout and indirect method of application to the disbarring power of this court." In the case of *In re Silkman,* 88 App. Div. 102, 84 N. Y. S. 1025, it was said: "It may be conceded that an inherent power exists in the court by which attorneys are admitted to practice law, to discipline them in their profession for any conduct exhibiting turpitude or the loss of that good character which was essential to admission and which must be deemed equally essential to continuance at the bar. But in the case of transgressions by judicial officers, the Constitution provides for punishment by removal from office, which in the absence of a distinct expression to the contrary, should be deemed exclusive." This case was approved in *In re Strahl,* 201 App. Div. 729, 195 N. Y. S. 386.

From a review of the authorities in which a judge was a respondent in a proceeding to deprive him of his license as an attorney at law we find an application of the cases sustains the following principles: An attorney at law while holding the office of judge may be disciplined for acts of

immorality, dishonesty, fraud or crime and his license taken away, and the fact of his holding a judicial office at the time does not render him immune from punishment, but on the other hand the weight of authority holds that the erroneous exercise of judicial discretion in the performance of a duty or executing a constitutional mandate may not, in the absence of showing such acts constitute fraud, crime or dishonesty, be made the basis of such a proceeding. To so hold, a judge could never know when his official or judicial acts would meet with disapproval and be compelled to defend his acts in an independent proceeding, which in many cases would be an indirect attempt to deprive him of office. The effect upon the independence of a judge would be deplorable and would tend to weaken the judicial branch of government. We hold the public policy which renders a judge acting in a judicial capacity in a court proceeding immune from liability applies with equal force to a disciplinary proceeding of the kind here involved. However, when the act is not official, is outside of his official duty, and not in the exercise of judicial power and purely private and personal, then we take cognizance of complaints without regard to official position. In short, judicial acts of the judge as a matter of public policy are not the proper object of a disciplinary proceeding, but the private and unofficial and independent actions of a judge as an individual may be subject to such jurisdiction.

This leads us to an analysis of the charges made and the facts established in order to separate the judicial acts of respondent from his private conduct. Over a period of five or six years respondent approved 367 bonds without complying in all respects with the requirements of the rule of court. Out of this number there was but one default, and that occurred because the defendant was sick and the default was afterwards vacated. Of these bonds over sixty were signed by Gendon and thirty-five by Bracciaventi. The principal misconduct charged in approving these bonds was

the failure of the respondent to ascertain the solvency of the bondsmen. Had these sureties been amply solvent no complaint could have been made. The dereliction here charged is in the respondent not being informed upon the question of the adequacy of surety, and in approving many different bonds by the same surety. Likewise the charge that Brin profited through fees charged in procuring these sureties would be equally true if the sureties offered had been amply solvent, and yet in the latter instance no offense legal or moral would have resulted. The proof is only inferential that respondent knew the actual financial condition of Gendon and Bracciaventi, and the fact there was no default on any of the bonds until the Luna bond, which started this controversy, may well have convinced respondent the sureties were solvent and substantial.

The number of bonds approved therefore does not control the issue, and it is the number approved which is chiefly argued as showing a conspiracy to do an illegal act. This illegal act is charged to be in permitting Brin to make fees from persons under arrest by having Gendon and Bracciaventi accepted as sureties. Brin could properly have charged a fee for procuring different sureties, or by procuring one surety amply solvent for the purpose, but no crime or offense would result by the court approving such bond. It is not made clear how an illegal conspiracy in this respect could result, for regardless of whether fees were charged for executing bail bonds, the court was nevertheless under the duty to admit one charged with an offense to reasonable bail, even though one person produced sureties for such defendants on many occasions. There is no claim that respondent received any money or other compensation from any of the sureties or from Brin. The charge of conspiracy is based principally upon the number of bonds executed by Gendon and Bracciaventi, a situation disclosed after the default of the Luna bond, but apparently not criticized by any one before this time.

It is also charged the respondent violated the rule of the municipal court in the matter of ascertaining the qualifications of bondsmen. There is a question as to whether this rule is advisory or mandatory. Some municipal judges thought it was mandatory and others thought it was advisory, and the record shows on over 2400 occasions municipal judges disregarded the provisions of this rule. In the matter of bail there is to be considered the constitutional mandate requiring every person charged with a crime not capital to be admitted to reasonable bail, and this question we believe is a judicial one. If the rule in question is mandatory it can be determined in a legal proceeding, but certainly the fact that some judges construed the rule mandatory and others advisory should not, in the absence of a determination of this question, be considered as showing the respondent acted corruptly or with evil motives.

While it does not distinctly appear in the record, no complaint had been made as to the manner of admitting prisoners to bail, or the approving of sureties until it appeared that one of the signatures of Gendon was a forgery, and from this it is inferred the respondent must have knowingly approved bonds presented by Brin in blank by either Gendon or Bracciaventi. We do not think this is established. Brin refused to testify and Gendon is mainly relied upon to establish the alleged misconduct. He was a witness in the conspiracy indictment against Brin and respondent. The latter was discharged upon his plea that judicial acts were not subject to indictment. During the hearing before the commissioners Gendon was in the custody of the State's Attorney as a witness in the criminal case. He testified eight of the bonds purporting to be signed by him were forged; that he delivered bonds executed in blank to Brin. He admitted acknowledging thirty-three of the bonds; as to twenty others he identified his signature but did not remember whether he acknowledged them. In one place he stated he only appeared before the judge eight times,

and at another that he had appeared ten or fifteen times. He admitted he swore the property was worth $5000, and that he never told the judge it in fact belonged to Brin. He said in one place he signed three or more bonds at a time ten or fifteen times, and later stated he did this only twice. As a matter of fact he attempted to testify from memory to each one of his bond transactions extending over a period of three or four years, which is a difficult if not impossible task. We think his testimony and his association with Brin furnish an explanation of what occurred.

Respondent had confidence in Brin and relied upon Gendon's affidavit of value without investigation. In every instance before the Luna transaction the person giving bail bond had appeared in court. His confidence was misplaced and he grew careless. We think it is a fair inference that respondent approved bonds presented by Brin purporting to bear Gendon's signature. His inability to explain each of these transactions is unfavorably commented upon, but it would be surprising indeed if he were able, with the pressure of court business over a period of years, to remember all of these occasions when bonds were presented for approval. His misplaced confidence and negligence doubtless enabled Gendon and Brin to impose upon his faith in them to use bail bonds which had been executed in blank, but without proof that this was knowingly done it does not show corrupt motives or moral turpitude. As a matter of fact Gendon and Bracciaventi were used as bondsmen by other municipal judges. There is no proof the prosecuting attorneys made any objection to their being accepted as bondsmen. The practice of accepting unscheduled bonds was general in the municipal court, as the record clearly shows that most, if not all, of the municipal judges occasionally approved such bonds, and many of them followed the practice extensively. The forfeiture of the Luna bond precipitated an investigation, and brought about the inquiry in the present case, and developed the situation of

what had been transpiring over a period of four or five years. This accumulation of instances in which a forfeiture might have been unavailing does not in itself establish corrupt motives or moral turpitude. The facts disclose the respondent was careless and negligent in the approval of bonds; of a slackness in the performance of his duties; and had small regard for the dignity of his judicial office, but these in themselves are not grounds for disbarment.

In approaching the question of whether respondent has been guilty of such conduct as would warrant his disbarment or suspension it must be borne in mind that proof of carelessness or mistaken judgment is not sufficient to justify disbarment. (*In re Pelz,* 356 Ill. 200; *In re Smith,* 365 id. 11.) It must be shown by clear and convincing proof that the conduct complained of was the result of dishonesty and improper motives. (*People ex rel. Chicago Bar Ass'n* v. *Lotterman,* 353 Ill. 399; *In re Smith, supra.*) The record must disclose a case that is free from doubt not only as to the acts done, but as to the motives by which they were accompanied. (*People ex rel. Rock Island County Bar Ass'n* v. *McCaskrin,* 325 Ill. 149.) One of the elements which should be considered, though not of controlling importance, is the previous reputation for honesty and integrity the respondent has built for himself. *People ex rel. Chicago Bar Ass'n* v. *McCallum,* 341 Ill. 578; *People ex rel. Chicago Bar Ass'n* v. *Johnson,* 332 id. 84.

It is apparent that the facts established in the main, deal with the judicial duties of respondent, and while the acts proven, aside from those involving judicial discretion, do not in our opinion establish crime or individual wrongdoing, yet respondent's connection with these men of evil repute, and his laxity and carelessness in permitting himself to be duped by them has been instrumental in permitting a fraud to be committed against the People of the State of Illinois, in that worthless bonds were approved

upon which no recovery could have been made in case of breach of condition. The fact no loss was occasioned is not sufficient to justify the unauthorized practice, nor the association and friendly relations with men of the character of Brin, Gendon and Bracciaventi. This conduct was most unbecoming and had the effect of making respondent appear to be of the same character. His judicial acts are smirched because of his association with these men, and serious danger to the interests of the State, and to the dignity and integrity of the judiciary has resulted. His acts as a judge may not be reached in this proceeding, but his acts as an individual in being at least partly responsible for fraud upon the People are subject to severe condemnation. It is difficult to separate under the present record the acts which are wholly or in part judicial from those of unbecoming conduct under the classification of personal acts.

The relator's contention that judicial conduct was subject to discipline has resulted in the production of evidence with no well-defined lines of cleavage between judicial and non-judicial acts. Under the circumstances we do not feel that we can discipline the respondent without taking into consideration the acts performed in a judicial capacity. Our concern for the independence of the judiciary requires us to hold, without in any degree condoning or approving the acts of respondent, that the rule should be discharged.

*Rule discharged.*

Mr. CHIEF JUSTICE STONE, dissenting:

While concurring in the principles announced in the opinion of the court, I consider that the record in this case justifies discipline.