223 So.2d 585

**In the Matter of Frank O. ALONZO, Attorney at Law.**

**3 Div. 341.**

Supreme Court of Alabama.

April 10, 1969.

Rehearing Denied May 8, 1969.

Thos. M. Haas, Mobile, for appellant.

Wm. H. Morrow, Jr., Gen. Counsel for Ala. State Bar.

HARWOOD, Justice.

This is a review of a disciplinary proceeding instituted by the Grievance Committee of the Alabama State Bar against Frank O. Alonzo.

The complaint contained three specifications or charges.

Charge 1 averred that from 1 January 1966 through 16 January 1966, Frank O. Alonzo, as a member of the law firm of Alonzo and Alonzo, comprised of Frank O. Alonzo and Reynolds T. Alonzo, Jr., permitted the use of his name by Mobile Adjustment Service, Inc., a Corporation, which was not licensed to practice law; that in so doing Frank O. Alonzo was guilty of violating Rule 11 of § A of the Amended Rules Governing Conduct of Attorneys in Alabama forbidding a person admitted to practice law in Alabama to permit the use of his name as attorney by any other person or corporation other than a person duly licensed as an attorney.

Charge 2 alleges that subsequent to November 1966, and prior to 16 January 1967, Frank O. Alonzo demanded a substantial increase in a monthly retainer fee being paid to the firm of Alonzo and Alonzo, or to Reynolds T. Alonzo, Jr., his brother and law partner, by Mobile Adjustment

Service, Inc., and offered to extend preferential treatment to Mobile Adjustment Service, Inc., in the trial of its cases in the Court of General Sessions of Mobile and the Inferior Civil Court of Mobile, after he took oath of office as judge of said courts; and at the same time and in connection with the demand for the increased retainer, threatened to deny to Mobile Adjustment Service, Inc., the fair and impartial use of said courts after he assumed the duties of judge of said courts, if Mobile Adjustment Service, Inc., refused to accede to his demands for an increase in said retainer; that in doing said acts Frank O. Alonzo was guilty of violating Rule 33, Section A of the Amended Rules Governing the Conduct of Attorneys in Alabama which provides that no member of the Bar of Alabama shall "Be guilty of any deceit or willful misconduct in his profession."

Charge 3 alleges that in doing the things described in Charges 1 and 2, Frank O. Alonzo was guilty of conduct unbecoming an attorney at law.

No pleading or answer was filed by Frank O. Alonzo to these charges.

Honorable Irvin J. Langford was duly appointed commissioner to take testimony on the charges, and a hearing was had before said commissioner on 7 and 8 August 1967.

The evidence adduced before Commissioner Langford consists in the main of transcriptions of tape recorded telephone conversations between Ben F. Stokes and Frank O. Alonzo, although other testimonial and documentary evidence of a corroborative nature was presented.

The evidence tends to show that Stokes, a practicing attorney in Mobile, and Frank O. Alonzo, who was admitted to the bar in 1961, had for a number of years been close friends. In the general election in November 1966, Alonzo had been elected as one of the judges of the Court of General Sessions of Mobile County. As such he was ex officio judge of the Inferior Civil Court of Mobile County. Stokes had been most active in Alonzo's campaign for the judgeship, and his client, Mobile Adjustment Service Inc., had been a liberal contributor to Alonzo's campaign.

Alonzo was sworn in as judge of the Court of General Sessions on 16 January 1967.

It appears that from 1 January 1966 through 16 January 1967, there was sent out to debtors on accounts handled by the Mobile Adjustment Service, Inc., a so-called "law letter." This letter was a collection letter and was on the stationery of Alonzo and Alonzo and signed by Reynolds T. Alonzo, Jr., a partner of Frank O. Alonzo. The Mobile Adjustment Service Inc., paid $100 per month for the use of the Alonzo firm name, and at least for a part of the time the letters were prepared and mailed from the Service Company's office. The bulk of the collection business of Service Company consisted of past due accounts owed physicians and hospitals in the Mobile area.

On 12 January 1967, Stokes and Alonzo engaged in a telephone conversation. Alonzo told Stokes that he wanted the $100 per month retainer paid to his brother and law partner Reynolds Alonzo, increased to $350 per month—and that he would make the Service Company pay this increase or "hurt" them in court. Stokes told Alonzo this was a matter between him, Reynolds Alonzo, and the Service Company and he would have to contact the Service Company directly.

Stokes made a written memorandum of this conversation upon its completion, and the next day purchased a tape recording device and attached it to his telephone.

Thereafter there were numerous tape recorded telephone conversations between Stokes and Alonzo. On 13 January 1967, Stokes called Alonzo and asked him if he was going to hurt him. Alonzo assured Stokes he would suffer no loss. Stokes asked whether or not Alonzo had discussed

with "Jerry" or "Gordon" (operators of the Mobile Adjustment Service), the matter of increasing the retainer, and Alonzo replied "No," that actions speak louder than words. Alonzo then stated that he would hold the assignments of the debts invalid, and would require every doctor to testify in person concerning the reasonableness of the charges represented by the bills assigned to Adjustment Service.

On 26 January 1967, some ten days after Alonzo had become presiding judge of the Court of General Sessions, and ex officio judge of the Inferior Civil Court of Mobile County, Stokes again called Alonzo and again inquired if Alonzo had discussed the increase of the fee to be paid Reynolds Alonzo with "Jerry" or "Gordon," and Alonzo again replied "No." Alonzo further stated that he was going to have all the F. H. Arnold cases put on his docket and he was going to deny judgments in those cases and that he was going to rule that the assignments to Arnold of the claims were invalid; that the help he could give Mobile Adjustment Service in the next six years would more than pay the $250 increase in the retainer, and that this help would be within the limits of the law. Alonzo further told Stokes that he was going to request a newspaper reporter to do an article on the activities of the Mobile Adjustment Service.

Stokes next conversed with Alonzo in the courthouse on 30 January 1967. In this conversation Stokes advised Alonzo that Mobile Adjustment Service was not going to increase the retainer. Alonzo then told Stokes that he was going to dismiss all cases filed under assignments of the debts and that the first action would be taken on 1 February 1967 in the Inferior Court.

On 1 February 1967, Stokes again called Alonzo. Alonzo inquired of Stokes what cases he handled that did not involve Mobile Adjustment Service. He reiterated that he would require all physicians and hospitals having suits in his court to put on testimony to show the reasonableness of their charges. Alonzo stated. "I'm not going to do anything outside the law, but I'm gonna make life miserable for them for a little while." There was another conversation between Stokes and Alonzo on 15 February 1967, which is largely repetitive of the prior conversations.

On 21 February 1967, Stokes called Alonzo and discussed the possibility of Stokes filing a mandamus action against Alonzo. Near the end of this conversation Stokes asked Alonzo if the increase of the retainer to $350 per month would help, to which Alonzo replied, "Things are gonna be so sweet and nice you just * * * we can go back to filing joint suits and just doing all sorts of things to make life easy and nice and wonderful."

On 26 February 1967, Stokes called Alonzo and informed him that the Mobile Adjustment Service was going to increase the retainer of Reynolds T. Alonzo to $350 per month and stated that Mobile Adjustment Service would then want what was coming to them and Alonzo stated they would get even better than preferential treatment. Stokes told Alonzo that $100 had already been paid and Alonzo denied knowledge of this payment, but stated that he would check and have Reynolds call, because "anything they do is strictly with Reynolds." He instructed Stokes to have the check made payable to Reynolds Alonzo since his name was on the letterhead. Stokes then inquired about the involuntary non suits already entered and was advised to come down and judgments would be entered.

Further evidence shows that after the payment of $250 increase in retainer to Reynolds T. Alonzo, Jr., in the form of a check, which was after the entry of the involuntary non suits, the said check was deposited to the joint account of Alonzo and Alonzo, as was a second check in the amount of $350 dated 13 March 1967, payable to Reynolds T. Alonzo, Jr.

The evidence further shows that after the payment of the increase of the retainer to

Reynolds T. Alonzo, Jr., the entries of involuntary non suits which had been entered in the cases in which the Mobile Adjustment Service was interested, were changed and judgments were awarded to the plaintiff in these cases.

Thus there was substantial evidence presented by the Grievance Committee in the proceedings below tending to show that in the interim between his election in November 1966, and his assuming the judgeship on 16 January 1967, this appellant concocted a scheme to extort from Mobile Service an increase in the retainer paid for use of the "law letter" mailed to debtors, said letters were on the stationery of Alonzo and Alonzo during the time the appellant was engaged in the practice of law with his brother Reynolds T. Alonzo, Jr., and bore the signature of Reynolds T. Alonzo, Jr., only. The extortion was to be forced by appellant's actions after he assumed the judgeship. While Mobile Service at first refused to agree to pay the demanded increase in the retainer, it did do so after appellant had assumed the judgeship and entered involuntary non suits in the cases in which it was interested. While the $250 per month increase was paid by check made payable to Reynolds T. Alonzo, Jr., appellant's brother and former law partner, the evidence shows that the checks were deposited in a joint bank account maintained by the appellant and his brother.

The fundamental issue presented on this review is whether the Alabama Bar can discipline a member who, prior to and during his tenure as judge of a court of record, has committed acts flagrantly reprehensible, particularly in view of two recent decisions by this court in Alabama State Bar ex rel. Steiner v. Moore, 282 Ala. 562, 213 So.2d 404, and Alabama State Bar ex rel. Steiner et al. v. Aderholt, 283 Ala. 436, 218 So.2d 149.

The decision in *Alderholt*, supra, was based upon the decision in *Moore*, supra, so we need look only to *Moore* and its effect upon the present issue.

In *Moore*, supra, the Bar Association had instituted disciplinary proceedings against Bob Moore, Jr., Judge of the Twenty-Fifth Judicial Circuit, on grounds that a large number of divorces were granted by him to parties whom he knew, or had reasonable cause to believe, were not bona fide residents of Alabama. Judge Moore filed a special plea challenging the jurisdiction of the Board of Commissioners of the Alabama State Bar to discipline a duly qualified and acting Circuit Judge, alleging, among other things, that "the Constitution and laws of the State of Alabama provided that Judges of the Circuit Court can be removed from office only by the Supreme Court of Alabama."

Thereafter Steiner, as President of the Alabama Bar Association, appointed a member of the bar as commissioner to take testimony on the charges. Judge Moore then filed in the Circuit Court of Montgomery County a petition for a writ of prohibition to prevent the officials and committees of the Bar Association, and the commissioner appointed to take testimony, from further prosecution of the charges. The relief sought by Judge Moore being granted by order of the Circuit Court of Montgomery County, the Bar Association perfected its appeal from such order.

In affirming the action of the lower court, this court wrote:

"The issue upon which a disposition of this appeal rests is whether a judge may be disciplined or disbarred by the Board of Bar Commissioners of the State of Alabama during the term in which he is holding office for acts *performed in a judicial capacity*. Another aspect of the issue is whether a judge, while serving as such, is a member of the State Bar. We believe that better reasoned decisions of courts of other jurisdictions adhere to the principle that the Bar cannot remove or discipline a judge for conduct as such judge acting in his *judicial capacity*, In re Borie, 166 La. 855, 118 So. 45; In re McGarry, 380 Ill. 359, 44 N.E.2d

7, nor can the Bar remove or discipline a judge where the Constitution provides the exclusive method of removal." (Citations omitted.) (Emphasis ours.)

After quoting at length from the early decision of State v. Gardner, 43 Ala. 234, the court observed of that decision:

"This, in substance, means that there can be no collateral approach to ousting a judge, for such prerogative is reserved to the State by the Constitution. In effect, the action of the Bar amounts to an attempt to remove a judge by indirection rather than by constitutional means.

"Here, the acts complained of were not by a judge in his alleged capacity as a lawyer, but were *judicial actions*. Erroneous or reprehensible as they may be, the conduct complained of was not conduct unbecoming an attorney at law enumerated by Rule 36, Section A of the Rules Governing Conduct of Attorneys in Alabama. It is, therefore, clear that the forum for actions against lawyers is a separate forum or jurisdiction than that provided by the Constitution for ousting judges." (Emphasis ours.)

The above observations must be read in the light of Opinion of the Justices, 279 Ala. 38, 181 So.2d 105, alluded to in the *Moore* opinion. In Opinion of the Justices, *supra*, this court opined that "all persons holding the offices of circuit judges must be lawyers admitted to practice in Alabama or entitled to be admitted without further examination." This same legal principle would be equally applicable to judges of inferior courts of record where the judges thereof are required to be learned in the law.

Thus, two propositions constitute the ratio decidendi of the *Moore* case: (1) That a judge cannot be disciplined by a bar association for his *judicial acts*, and, (2) that to permit a judge of a court of record to be disbarred for a judicial act would in effect be a removal of a judge from his office by indirection since if disbarred, the judge would be disqualified to continue in office and such proceedings cannot be permitted in view of the constitutional provisions regulating the removal of judges.

Under the provisions of Section 175 of our Constitution, judges of inferior courts created under the authority of Section 168 of our Constitution may be removed for any of causes specified in Section 173 of our Constitution, by the Circuit Courts or other courts of like jurisdiction, under such regulations as may be prescribed by law, provided that the right of trial by jury and appeal be secured.

■ The first proposition, that is that a judge cannot be disciplined for his judicial acts, is of fundamental soundness, and is essential to the maintenance of an independent judiciary.

The facts presented by the Grievance Committee in this case are indeed unique, in that they tend to show that prior to assuming the judgeship to which he had been elected, Alonzo announced his plans to Stokes to use his position as judge unethically, probably to his own advantage, and certainly to the disadvantage of certain litigants in the court over which he presided. The evidence further tends to show the execution of this plan by Alonzo after he assumed his judicial office.

■ A "judicial act" is an act done in furtherance of justice, or a judicial proceeding by a person having the right to exercise judicial authority. Ross v. Fuller, 12 Vt. 265, 36 Am.Dec. 342. It is an act resulting from judgment or discretion based on evidence received at a hearing provided by law. Mayor of City of Jackson v. Thomas, 44 Tenn.App. 176, 313 S.W.2d 468. "Judicial acts" are the performance of judicial acts which have been confided to a judicial officer, to be exercised in a judicial way. Opinion of the Justices, 280 Ala. 653, 197 So.2d 456.

Common sense and a due regard for elemental morality would necessitate a re-

jection of any concept that the acts of Alonzo in connection with his actions relating to the Mobile Service Adjustment suits were in truth and in fact "judicial acts." Thus, the first basis for the decision in *Moore*, supra, fails if attempted to be applied to the present case.

The second basis on which *Moore* was posited was that to allow a judge to be disciplined for judicial acts would, if the judge be disbarred, in effect be a removal from office contrary to the constitutional provisions relating to the removal of judges from office. In cases of inferior court judges this can only be done by a jury trial.

But such situation does not exist in the present case. The testimony was heard by the commissioner appointed to take testimony on 7 and 8 of August 1967. Transcripts of such evidence were furnished to all of the Commissioners of the Alabama State Bar.

At a meeting of the Board of Commissioners on 16 December 1967, the attorney representing Alonzo announced he was willing to submit the matter on the testimony as shown by the transcript, and on a special plea to the effect that the Board of Commissioners did not have jurisdiction of the cause in that the matters complained of were done by Alonzo as judge of the Court of General Sessions of Mobile County or as ex officio judge of the Inferior Civil Court of Mobile County.

Counsel representing the Grievance Committee of the Bar Association agreed to such submission.

The Board of Commissioners then went into executive session, and after deliberation, reopened the proceedings, and announced the resolutions of guilty as to each specification, and the penalty of disbarment.

As above stated, this action by the Board of Commissioners was on 16 December 1967.

Previously, on 6 July 1967, a verdict and judgment of impeachment was rendered after a trial on impeachment proceedings against Alonzo begun on 27 June 1967. The impeachment proceedings were based on the same conduct as involved in the present proceedings. On appeal the judgment impeaching Alonzo was affirmed on 6 February 1969, rehearing denied 6 March 1969. Alonzo v. State ex rel. Booth, 283 Ala. 607, 219 So.2d 858. Thus Alonzo had been removed from his judicial office prior to the taking of testimony before the commissioner appointed to take testimony, and some five months prior to the hearing before the Board of Commissioners.

In this situation the removal of a judge by indirection with its corollary of maintaining judicial independence is not involved. See Schoolfield v. Tennessee Bar Association, 209 Tenn. 304, 353 S.W.2d 401.

Thus the second basis of the *Moore* decision, supra, has no application.

In the *Moore* case, supra, the question was posed as to "whether a judge, while serving as such, is a member of the State Bar." Because of the conclusions reached it was unnecessary to answer this question. We think the question answers itself.

When one is admitted to the bar of this state and licensed to practice law by this court, he remains enrolled as an attorney from that time on unless his right to practice is destroyed by a judgment of suspension or disbarment. True, during the time an attorney may hold certain judicial offices, his right to practice is suspended. He yet remains on the roll of attorneys of this court, and must be a member of the bar to be qualified to hold certain judicial offices.

Basically, a disbarment proceeding is an inquiry into the conduct of an attorney to determine whether action should be taken

to protect the public and the standards of the legal profession. In re McKay, 280 Ala. 174, 191 So.2d 1.

■ Where, as here, a member of the bar holding judicial office commits fraudulent, corrupt, and immoral acts by originating an extortion plan prior to entering upon a judgeship, and executes that plan after assuming the powers of the judgeship, by actions that cannot by any stretch of the imagination, rationally be deemed judicial or official acts, and where such judge has been removed from office by due and legal impeachment proceedings prior to disciplinary action by the Bar Association, it would indeed be sadly anomalous to conclude that the Bar could not cleanse itself of such unfit member on any theory that judicial robes protected such conduct.

As pointed out in the Matter of Mattera, 34 N.J 259, 168 A.2d 38, an act of misconduct may offend the public interests, and other interests in a number of ways. The general public interests were offended by Alonzo's conduct in his judicial office because of his breach of his judicial oath. For this conduct he was impeached.

Another public interest, and more particularly, the interest of the legal profession in the maintenance of decent and honorable conduct of its members, was also grievously offended by Alonzo's conduct.

■ The remedies of impeachment and disciplinary action by the Bar Association are not cumulative to protect a single interest, but are designed to protect separate needs.

Under the particular facts of this case we can think of no reason why the Bar Association and this court could not act to remove from the roll of attorneys a member so lacking in a sense of ethics as shown not only by the evidence presented, but also established by the judgment of impeachment.

Affirmed.

LIVINGSTON, C. J., concurs.

COLEMAN, J., dissents.

MERRILL, Justice (concurring specially).

I concur in the result insofar as it rests upon charges and evidence as to acts of petitioner while a practicing attorney. Also, I concur in that part of the opinion which holds that an impeached judge may subsequently be disbarred. I cannot agree that ordinary acts of a judge, such as continuing, hearing or dismissing cases, and rendering judgments, regardless of how perverse or wicked the motivation for these acts might be, are not judicial acts.

LAWSON, J., concurs.

BLOODWORTH, Justice (concurring specially).

I concur in the result insofar as it rests upon charges and evidence as to acts of petitioner while a practicing attorney. To rest the decision upon acts performed as a judge leads, in my opinion, to the indirect discipline or disbarment of a judge by the Bar in violation of the Alabama Constitution which provides impeachment as the exclusive mode for the removal of judges. Sections 173, 174, 175, Art. 7, Constitution of 1901; *Moore,* supra; *Aderholt,* supra. I consider this a fundamental "essential to the maintenance of an independent judiciary."

SIMPSON, J., concurs.

On Rehearing

HARWOOD, Justice.

In brief on application for rehearing counsel has to our satisfaction demonstrated that the law letter which we stated had been sent out on stationery of Alonzo and Alonzo was in fact sent out, during the period specified in Charge 1, on stationery of Reynolds T. Alonzo, from the office of Mobile Adjustment Service, and bore the signature of Reynolds T. Alonzo only.

During the time the stationery bearing the letterhead of Alonzo and Alonzo was used, the law letters were mailed from the office of Alonzo and Alonzo, and not from the office of Mobile Adjustment Service.

This being so, we are in accord with the contention of counsel for the respondent below that the evidence is insufficient to support the resolution of guilty under Specification 1.

This does not, however, in anywise necessitate a reversal of the affirmance of the resolutions of guilty of Specifications 2 and 3.

In fact the offense charged in Specification 2, that is, guilty of violation of Rule 33 section A by being guilty of deceit or willful misconduct, was by far the most serious offense charged and established.

If guilty of this offense, it would be axiomatic that petitioner would be guilty of violation of Rule 36 section A, that is, of conduct unbecoming an attorney at law. Ex Parte Newton, 265 Ala. 650, 93 So.2d 164.

 Disbarment proceedings are basically an inquiry into the conduct of an attorney to determine whether action should be taken by the Bar Association acting through its Board of Commissioners, or in other situations, by a court, to protect the public or the courts. In re McKay, 280 Ala. 174, 191 So.2d 1. Such proceedings are neither civil nor criminal, but are sui generis. Ex parte Messer, 228 Ala. 16, 152 So. 244; Ex parte McKay, supra.

As to our functions on review in disciplinary proceedings, we observed in Ex parte Newton, 265 Ala. 650, 93 So.2d 164:

"In reviewing disbarment proceedings before the Board of Commissioners, this Court possesses inherent power as well as specific statutory authority to take such action as is agreeable to our judgment; and we may adopt the findings and conclusions of the Commissioners or may alter or modify them. Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A.L.R. 671; Ex parte Grace, 244 Ala. 267, 13 So.2d 178; Ex parte Cooke, 263 Ala. 481, 83 So.2d 195; Alabama Code of 1940, Title 46 § 25."

Having concluded on this rehearing that the evidence was insufficient to support Specification 1, our opinion is hereby modified to the extent of holding that Specification 1 was not supported by the evidence.

We adhere to our views as to the affirmance of the Resolutions finding the petitioner guilty under Charges 2 and 3. In fact counsel for petitioner has not in brief raised any contention as to our approval or affirmance of Charges 2 and 3.

Opinion modified; application overruled.

All the Justices concur, except COLEMAN, J.

COLEMAN, Justice (dissenting).

I agree that the evidence does not support Charge 1, and that the conviction should be reversed as to that charge. I adhere to my dissent as to Charges 2 and 3.