219 So.2d 858

**Frank O. ALONZO**

**v.**

**STATE of Alabama ex rel. Carl M. BOOTH, District Attorney.**

**I Div. 474.**

Supreme Court of Alabama.

Feb. 6, 1969.

Rehearing Denied March 6, 1969.

Thos. M. Haas, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for appellee.

BLOODWORTH, Justice.

This case was originally assigned to the author of the dissenting opinion. The facts and assignments of error are stated quite thoroughly and in detail in that opinion. It is unnecessary to repeat them here. We agree with each conclusion reached in the dissenting opinion respecting each assign-

**610**

ment of error except that which holds the trial court erred to reversal in denying defendant's request to have the tapes examined electronically by an electronics expert to determine whether they had been altered or changed.

■ The testimony of State's witness, Stokes, who made the recordings is positive that the recordings were authentic, accurate and original, and that no changes, additions or deletions had been made thereto. He further testified they have never been out of his possession. Experts for both the State and defendant who examined the tapes agreed that their visual examination disclosed no splicing or alteration.

Defendant's expert witness, Worthy, states with reference to one of the tapes "it would give some possibility of this tape being recorded on another machine." With respect to another of the tapes he testified that it "could indicate that the tapes had been tampered with or that the tapes were defective in some way. I could not determine exactly any tampering on these tapes unless I was given the opportunity to make an electronic check of the tapes." At most, his testimony reduces itself to a "strong possibility that if tested with the proper electronic equipment you could detect slips and pops and patches," and that "a complete electronic check may bring out the facts that it has been [spliced, dubbed, etc.]," but "now it is not a guarantee that it will."

It seems to us that this decision involves two points, whether the court is required under "due process" to permit a test on the tapes by defendant's expert, and secondly, whether the court should have granted a continuance, halted or suspended the proceedings to enable the expert to do so, if such was necessary.

■ The law in Alabama, and generally, is that it is discretionary with the trial court whether tests and experiments

will be permitted outside of court for the purpose of using the result as evidence. 23 C.J.S. Criminal Law § 967; Campbell v. State, 55 Ala. 80. Likewise, in Alabama, our courts have always held it is discretionary with the trial court whether it should halt or suspend the trial to enable a party to secure or produce witnesses in court. See, cases at 6A Ala. Dig., Criminal Law, ☞649, (1), (2), and (4). And, in the exercise of that discretion the trial court is not to be reversed save for gross abuse of discretion.

We find no gross abuse of discretion here on the part of the trial court. We feel this view is strengthened when the statements of defendant's witnesses are considered—that there is only a "strong possibility" that the electronic device "could" detect alterations, and, in view of the unequivocal statements of Stokes that the tapes had neither been altered nor been out of his possession.

The New York case of People v. Koenig, 34 Misc.2d 711, 228 N.Y.S.2d 1012, supports this conclusion. It held that it is discretionary with the trial court whether it grants a continuance to secure proof (in that case) of an expert as to whether there was an additional writing added to a "policy slip" introduced for the State. The New York court held the trial court was not to be reversed except for abuse of discretion although it did find abuse of such discretion in that case.

To summarize, we hold that the defendant's request to have the tapes examined electronically by an electronics expert to determine whether they had been altered or changed is a matter which addresses itself to the sound judicial discretion of the trial court not to be reversed save for gross abuse of that discretion. We find no such abuse of discretion under the facts of this case, and that the case should be affirmed.

Affirmed.

LIVINGSTON, C. J., and MERRILL and HARWOOD, JJ., concur.

LAWSON, SIMPSON and COLEMAN, JJ., dissent.

COLEMAN, Justice (dissenting):

The defendant, in an impeachment proceeding, appeals from a judgment of guilt rendered against him on the verdict of a jury on a charge of corruption in office.

In Specification I, it is alleged that defendant was elected Judge of the Court of General Sessions of Mobile County in 1966 and was installed in that office on January 16, 1967; that he became Ex officio Judge of the Inferior Civil Court of Mobile County by virtue of such election; that, on or about January 12, 1967, before defendant took office, he discussed with Benjamin F. Stokes, attorney of Mobile, the matter of raising the amount to be paid to defendant's brother, Reynolds T. Alonzo, Jr., for permitting his name and stationery to be used by the Mobile Adjustment Service, Incorporated, hereinafter called Adjustment Service; that defendant stated that his brother was getting one hundred dollars per month for the use of his name and stationery as aforesaid, that defendant wanted to increase it to three hundred and fifty dollars a month, and that, if it were not increased, defendant, as such judge, would make Adjustment Service increase it to three hundred and fifty dollars by hurting Adjustment Service in court; that, if Adjustment Service did not pay the three hundred and fifty dollars a month to defendant's brother, defendant would make Adjustment Service bring every doctor to court to testify in cases which Adjustment Service had in court and that defendant would further see that assignments made by doctors to Adjustment Service were invalid; that on or about January 26, 1967, after defendant had been inducted into office, he stated to Stokes that defendant wanted the fee to go up before the first of February and that defendant was going to get all of the Adjustment Service cases put on defendant's docket and "then every case that was on F. H. Arnold (an official of Mobile Adjustment Service, Incorporated) would not be given a judgment, even if it was uncontested . . . .," and that all defendant was going to do was not give Adjustment Service any judgments; that, if that would not be enough, defendant would call Arch McKay, a newspaper man, and tell him that defendant wanted a nice story written that defendant was going to do everything he could to protect the poor citizens. It is further alleged that defendant made additional threats to force payment of the fee of three hundred and fifty dollars a month, and that on or about February 21, 1967, Stokes told defendant that Adjustment Service was going to pay the three hundred and fifty dollars a month and "wanted a fair shake in court"; that defendant replied that, when he made a deal, he was going to stick to it and Adjustment Service "would get even better than preferential treatment and that as long as (Adjustment Service) did not ask him, Frank O. Alonzo, Anything to put him, (defendant), in a bad spot, he, (defendant), would do anything."

It is further alleged that Stokes stated that the extra two hundred and fifty dollars would be sent; that defendant instructed Stokes to make the check payable to Reynolds T. Alonzo, Jr., and that defendant would give judgments on the involuntary nonsuits that had been rendered; that on or about February 1, 1967, defendant, as such judge, continued nine cases of an official of Adjustment Service, that, on or about February 21, 1967, defendant continued many more cases on the same grounds and refused to render judgments for plaintiffs in many cases handled through Adjustment Service even though the defendants were not present and the cases were uncontested; but, after the payment for February of one hundred dollars, to Alonzo and Alonzo, and two hundred and fifty dollars to Reynolds T. Alonzo, Jr., by Adjustment Service, the judgments of involuntary nonsuit were, by order of defendant, scratched out of the records of the Inferior Court and judgments for plaintiffs were rendered by defendant on or about

February 28, 1967, for the amounts sued for; and that thereafter, on or about March 13, 1967, payment of three hundred and fifty dollars was made to Reynolds T. Alonzo, Jr., by Adjustment Service in accordance with the understanding between defendant and Stokes.

In Specification II, it is alleged that after defendant was formally inducted into office, he instructed certain clerks in the office of his courts to prepare reports for the Merchants Credit Association of Mobile, Alabama, Incorporated; the work to be done ahead of all other work and to be done during the hours of employment for which they were paid by Mobile County, and for which services William Theris, Clerk of the Court of General Sessions, was paid the sum of one hundred dollars a month by said Merchants Credit Association for a period of several months until the practice was stopped by another judge of the Court of General Sessions at the time defendant reportedly turned in his resignation, such work by the subordinate clerks working under William Theris on such reports requiring several hours a day.

The grand jury made its report on June 1, 1967. On June 5, 1967, the district attorney filed an information against defendant. On June 5, 1967, the presiding judge of the circuit court made an order setting the case for trial on June 27, 1967, and a copy of the order was served on defendant on June 6, 1967.

On Tuesday, June 27, 1967, the court proceeded first to hear motions filed by defendant. Hearing on the motions continued until some hour, apparently near the close of the afternoon of Wednesday, June 28. Shortly before adjournment on Wednesday, examination of the venire was begun. It appears that selection of the jury was completed shortly after the court convened on Thursday, June 29. The trial continued through Friday and Saturday. The court recessed until Monday morning, July 3. The trial continued on July 4, 5, and 6, being concluded on July 6 when the jury brought in the verdict.

The evidence for the state tended to support the allegations of the specifications, and the evidence for defendant tended to support his plea of the general issue, not guilty.

Defendant appealed. The appeal was argued orally before this court on November 14, 1968, and submitted to this court on that day. We undertake to consider the errors argued in brief on behalf of defendant.

## 1. Special prosecutor.

The case for the state was presented throughout the trial by a special prosecutor. We understand that the district attorney, or one of his assistants, was present in court throughout the trial but took no part in the prosecution so far as the record discloses.

Defendant argues that the special prosecutor "prosecuted the entire case from the beginning to end and for aught that appears no public prosecutive official took any part in the prosecution, other than to sit in the Courtroom"; and that, "This fact alone requires, on reasons of sound public policy, that this case be reversed with instructions that the duly elected District Attorney of Mobile County conduct the prosecution, with such assistance as he may deem proper."

Defendant contends that an impeachment trial is governed by the rules of criminal procedure. In various cases, this court has said ". . . . that impeachment, under our Constitution, is a criminal prosecution," State ex rel. Attorney General v. Buckley, 54 Ala. 599, 620; ". . . . we recognize the rule of conviction beyond a reasonable doubt as applicable to this case . . . .," State ex rel. Attorney General v. Tally, 102 Ala. 25, 35, 15 So. 722, 725, an impeachment proceeding; "Impeachment proceedings are highly penal in their nature, and are governed by the rules of law applicable to criminal causes," Nelson v. State ex rel. Blackwell, 182 Ala. 449, 453, 62 So. 189, 190; State ex rel. Attorney

General v. Hasty, 184 Ala. 121, 124, 63 So. 559; ". . . . an impeachment proceeding under our Constitution is a criminal prosecution in which defendant has certain constitutional rights safeguarded to a defendant in a criminal case, though not a trial by jury," State ex rel. Knight v. deGraffenried, 226 Ala. 169, 170, 146 So. 531, 532; "An impeachment proceeding under section 174 of the Constitution is a criminal prosecution," State ex rel. Mullis v. Mathews, 259 Ala. 125, 129, 66 So.2d 105, 107; "This impeachment proceeding is in the nature of a criminal prosecution . . . .," State ex rel. Gallion v. Thomas, 283 Ala. 227, 215 So.2d 443.

■ This court has said, however, that the proceeding for impeachment of an official as to the jury and the right to strike is like bastardy; it partakes of the nature of both civil and criminal actions. Batson v. State ex rel. Davis, 216 Ala. 275, 281, 113 So. 300. In *Batson*, this court cited the statute, now § 189, Title 41, Code 1940, and other statutes, and concluded that the defendant, in impeachment, is entitled only to the same number of strikes as the state.

■ With respect to a special prosecutor, we are of opinion that an impeachment trial is governed by the rules of criminal procedure. In an appeal from conviction for murder in second degree, this court said:

"Special counsel may appear in the prosecution as an assistant to the solicitor and with the consent of the court. The management of the case remains with the official representative of the state, in whose name the special counsel appears. The consent of the state is all the authority needed by special counsel; hence a motion by defendant to require special counsel to show his authority is properly overruled. (Citations omitted)" Handley v. State, 214 Ala. 172, 174, 106 So. 692, 694.

In the instant case, defendant filed a motion to require the special prosecutor to produce or prove his authority. The court granted this motion and the special prosecutor stated:

". . . . I represent Mr. Ben Stokes and Mr. Gordon Armstrong and I have been employed to proceed in the prosecution of this case. . . . ."

The special prosecutor stated further that "this is being done with the solicitor's consent." We find nothing in the record to the contrary.

Stokes and Armstrong both testified against defendant. They were the principal witnesses to prove the allegations of Specification I. Armstrong's business is: Mobile Adjustment Service, a corporation, which is in the printing, advertising, and collection business. Armstrong testified that at least 95% of the litigation of his business is carried through the courts of which defendant was judge and that the total of claims filed in 1966 amounted to approximately $500,000.00, of which he collected approximately $100,000.00.

Stokes is an attorney employed by Adjustment Service. He testified that he had stated to the brother of defendant that he, Stokes, made last year as fees on collections for Adjustment Service "something around twenty-five or twenty-eight" thousand dollars.

After the special prosecutor had stated his authority as aforesaid, defendant made an oral motion to exclude all attorneys other than the district attorney and his lawfully commissioned assistants. The court denied defendant's oral motion. In arguing that the court erred in permitting the special prosecutor to conduct the trial for the state, defendant relies on State ex rel. Mullis v. Mathews, 259 Ala. 125, 66 So. 2d 105, wherein a divided court held constitutional a statute authorizing the institution of an impeachment by five resident taxpayers and the prosecution of such impeachment by such counsel as the taxpay-

ers might wish to employ. We find nothing in *Mathews* which holds it improper for private persons to employ special counsel to conduct for the state an impeachment trial, brought on findings by a grand jury, when the district attorney consents thereto. We hold that the trial court did not err in permitting the special prosecutor to so conduct the trial in the instant case.

### 2. *Prosecutor's remarks.*

■ Defendant argues that the judgment should be reversed and a new trial ordered because of improper statements made by the prosecutor in opening statement, throughout the trial, and in closing argument.

The record is replete with side remarks and other statements which ought not to be made in the trial of a lawsuit. The trial court many times sustained objections to remarks of counsel and instructed the jury to disregard those remarks. During the opening statement of counsel to the jury, the court, in response to an objection by defendant, said:

"THE COURT: I realize that but I think you both have really gotten out of bounds in the opening statement. To tell you the truth, I really don't know how to keep you in."

On at least three separate occasions, the court said let's "stop" or "cut out" the bickering. On one occasion, the court said to the prosecutor: " . . . . I would say it's a dog-fall between you and this gentleman as to efforts with asides—" On another occasion, the court said:

"THE COURT: I'm going to instruct counsel for the prosecution and the witness to stop bickering with each other, casting personal insults."

We disapprove as improper many remarks made by the prosecutor. Apparently, some of his remarks may have been reply in kind. The court instructed the jury to disregard them and we are not persuaded that the court erred to reversal in denying defendant's motions for mistrial on account of the prosecutor's remarks or that we should reverse for that reason.

### 3. *Court's statement.*

■ On one occasion, the court sustained the state's objection to a question propounded to a witness by counsel for defendant. Defendant's counsel said:

"We except. And I submit with all due respect for the Court is unduly limiting my cross examination on the very issues that were touched on on direct."

The court replied that he did not think so, and:

" . . . . If I am, I'm sorry and the Appellate Court will correct me, but I can't see that there's anything on direct that had much to do with the Mobile General Hospital."

On defendant's request, the jury retired from the courtroom and defendant moved for mistrial. The court denied the motion and defendant contends that the court's statement: "If I am, I'm sorry and the Appellate Court will correct me"; is "very damaging to a Defendant and is so prejudicial in its ramifications that the Appellate Court must reverse."

Defendant relies on Brothers v. State, 236 Ala. 448, 453, 183 So. 433, 436, where this court disapproved argument to the jury that " ' . . . . if you make a mistake and impose a higher punishment . . . . than you should, there is a higher court that will correct it . . . . ' " Defendant cites also Pilley v. State, 247 Ala. 523, 527, 25 So.2d 57, where this court held similar argument to be improper for the reason that the effect of the argument would lead the jury into the mistaken belief that their findings on the facts could be reviewed by a higher tribunal and thereby diminish the jurors' sense of the responsibility resting on them.

The instant remark is not to effect that an appellate court will review the findings of the jury. The remark is to effect that an appellate court will review the rulings of the trial court. The remark is a correct statement of the law, and we do not think it will tend to mislead the jury or that the remark is improper.

### 4. *Motion to quash.*

Defendant asserts that the court erred in denying defendant's motion to quash the information.

■ Grounds 1 and 2 of the motion are that when the grand jury was recalled into session on May 30, 1967, the court, in its charge concerning the matter of the defendant, coerced the grand jurors to such an extent that they would feel compelled to return a bill against defendant in violation of the Constitution of Alabama and of the United States, and in violation of the due process clause of the Constitution of the United States.

Defendant introduced into evidence the minutes of the proceedings on May 30, 1967. As here pertinent, the court charged the jury as follows:

" . . . . Mrs. Sexton, and gentlemen, I first want to tell you how very extremely reluctant the court was to call you back. I know, for one, that you served at a sacrifice when you served in the April Grand Jury. I know some of you are here today serving again at a sacrifice to yourself or perhaps to your family.

"It was the unanimous consensus of opinion by all of the Circuit Judges, all seven including myself, that the gravity of the situation demanded your recall. It doesn't usually happen, but it did happen here and my jury of April the 3rd happened to be the one to be recalled. I do regret it but the circumstances fully warranted it according to my humble opinion. That's why you are here. . . . .

" . . . . . . . . . . .

"THE COURT: Members of the Grand Jury, which has been recalled, the court will not go into the alleged offense, that will be presented to you by the able District Attorney, Mr. Carl Booth. But as I mentioned at the outset, it was a very grave matter which prompted the court—all Judges of the court—to have you recalled. Do not let the gravity of any offense blind your sense of reason and your sense of absolute impartiality. You will hear the evidence in this particular case and then you will return—you will base your indictment, whether it be a true bill or no bill, according to the evidence as you see it. If you don't have probable cause for believing it to be done, of course, you would not return a true bill. If you do have probable cause for believing that the alleged offense was committed by the person charged with the offense then, of course,—if twelve jurors, if twelve of you agree that you have probable cause for believing and do believe that he was guilty of the offense charged then you would return to the court a true bill; otherwise you would not. I will not go further into details. But, again, I want to say we regret not only having to call you back, but the reason which gave rise to the recall. Gentlemen, the case will be your's for your decision and Mr. Bailiff will you take the Grand Jury back to the jury room."

We are of opinion that the charge to the grand jury on May 30th is not coercive and that grounds 1 and 2 of the motion are not sustained.

■ Grounds 3, 4, and 5 of the motion are that the court, on June 1, 1967, erroneously charged the grand jury that another vote on the bill against defendant could be taken only if a majority of the grand jury instructed the foreman that they wished to take another vote.

Defendant introduced in evidence a transcript of the proceedings had when the

grand jury reported to the court on June 1, 1967, and returned a bill against defendant. The transcript shows "the foreman and 15 Grand Jurors present." We take this to mean that sixteen grand jurors were present. At that time one juror stated that he felt the grand jury should take another vote. We have read the pertinent parts of the transcript in consultation. It shows that on the day preceding June 1, the grand jury had voted; that on June 1, the jurors discussed whether they should take another vote; that they decided to leave it to the court whether another vote should be taken. The following appears next in the transcript:

"THE COURT: If the majority of the members of the Grand Jury instructed Mr. Ladd, who is the foreman of the Grand Jury, to call for another vote he would have no alternative except to do it, call for another vote. Now, what I am asking you Mr. Ladd, speaking for the jury, did the majority of the jurors in the Grand Jury assembled request a re-vote?

"MR. LADD: May I say what went on, Judge?

"THE COURT: No, just answer that question first?

"MR. LADD: No, sir, they didn't.

"THE COURT: They did not.

"JUROR: It was not voted, Your Honor.

"THE COURT: It was not voted on?

"JUROR: Wasn't brought up.

"THE COURT: You mean it wasn't a vote—a revote.

"JUROR: No, sir. It was not voted on to vote.

"THE COURT: In the courtroom is no place to ask for a revote.

"JUROR: Thank you, Your Honor.

"THE COURT: The court has limited power as to what it can do with a Grand Jury—the control it has over them—and the court has not tried to exercise any power that the courts do not have in the conduct of this grand jury. If in the grand jury chambers a majority had requested Mr. Ladd, foreman of the jury, to ask for a re-vote then as I say, that could have been done but not in the courtroom, no.

"JUROR: It wasn't brought up to see whether or not—in other words, we discussed whether or not to have a vote, another vote, and it wasn't brought up whether to vote or whether not to vote and we decided to let you decide.

"THE COURT: Well, you had the same privilege of making that request in the . .

"MR. LADD: Your Honor, that is a misstatement.

"THE COURT: . . you had the same right to make that statement in the grand jury room as you are now making in open court, and that request not having been made in the grand jury room where twelve of you in the privacy of the grand jury room, not under the influence of all the spectators, you could very well have done it if the majority wanted it. That was not done and the court is going to accept this report. You can make any other statement you care to, Mr. Ladd."

If further appears that two of the grand jurors had objected to the way the others voted. It does not appear from this transcript that finding the bill against defendant was not concurred in by at least twelve grand jurors. As to the matter of another vote, or reconsideration of the prior vote, we are not advised of any applicable statute, rule, or decision.

§ 89 of Title 30, Code 1940, provides that the concurrence of at least twelve grand jurors is necessary to find an indictment, and, when so found, it must be endorsed "a true bill" and the endorsement signed by the foreman. We do not understand the record

to show that this statute was not complied with in the instant case.

Not more than two, possibly one, grand juror expressed dissent from the finding of the grand jury. Sixteen grand jurors were present when the grand jury reported. If five grand jurors had expressed dissent, then another question would be presented, but that question is not presented here. Grounds 3, 4, and 5 of the motion are not sustained.

Grounds 6 through 11 are that the bill was returned on illegal evidence, on insufficient evidence, on illegally obtained evidence, or on no evidence on which the grand jury could base the bill; that the grand jury refused to inquire as to all material facts; and that the grand jury refused to hear material witnesses.

When it appears that witnesses were examined by the grand jury, or that the grand jury had before them legal documentary evidence, no inquiry into the sufficiency of the evidence is indulged. Washington v. State, 63 Ala. 189; Agee v. State, 117 Ala. 169, 23 So. 486; Fikes v. State, 263 Ala. 89, 81 So.2d 303; Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Loyd v. State, 279 Ala. 447, 186 So.2d 731.

We do not understand that defendant asserts, in the instant case, that witnesses were not examined by the grand jury or that the grand jury did not have before it legal documentary evidence. The grounds of the motion to quash here considered presented an issue of fact to be determined by the trial court before the defendant could be required to plead, with the burden on the movant. Hill v. State, 20 Ala.App. 197, 198, 101 So. 298, and authorities there cited. Defendant did not sustain the burden and grounds 6 through 11 are not sustained. See Gore v. State, 217 Ala. 68, 114 So. 794.

Grounds 12 and 13 are that twelve grand jurors did not concur in finding the bill against defendant. Defendant says in brief that he asked numerous questions of members of the grand jury "to prove that twelve of their number did not concur in the Bill of Impeachment and made a showing that he expected to show this when the Court sustained objection to these questions. The gist of what the Appellant was trying to show concerning the matter of the revote of the Grand Jury is shown by the showing made by Counsel on Page 73 of the Record."

On pages 73 and 74 of the transcript, counsel for defendant made a statement to the court as follows:

" . . . . I expect to show Judge, again I make a showing, that the grand jurors came back somewhere around two o'clock, I don't know the exact date, Mr. Baker might, but the Court sustained the objection—and for the next hour or so in that room Mr. Baker and the other jurors attempted to have another vote and Mr. Ladd would not let them have another vote, so when they went in the courtroom, just as the Court said a minute ago what they should do, one of the jurors wanted to ask Judge Gaillard that we want another vote, they wouldn't have a vote when we were in there so we'd like to have Your Honor let us have another vote. In other words we expect to show that some of the jurors wanted a re-vote, but Mr. Ladd, the Foreman, wouldn't let them have a re-vote and they argued about it for in excess of an hour while courtroom Number One was loaded and waiting for them. Then, when they came in the courtroom, having failed to get the Foreman to give them the right to vote, they were erroneously instructed by Judge Gaillard that only a majority could give them that right to vote, and then he even asked Mr. Ladd whether there was a majority. Now if the Court please, if I can't show that, I can't show an essential part of the Motion. That's a showing of what we would expect to show on that issue by this witness."

We do not approve the statement of the court that only a majority of the grand jury

could require the reconsideration of a previous vote. If, when the grand jury made its report, enough grand jurors did not concur in finding the bill so that the number concurring in finding the bill was less than twelve, then such a bill does not comply with the statute. As we understand defendant's offer to show, however, it does not indicate that defendant offered to show that six of the seventeen grand jurors wished to take a "re-vote." The offer is to show that "*some* of the jurors wanted a re-vote." Any number of non-concurring jurors less than six of the seventeen would not affect the validity of the bill found against defendant.

We hold that error in denying the motion to quash has not been shown.

### 5. Tape recordings.

The substance of Specification I is that defendant undertook to compel Adjustment Service to increase from one hundred dollars to three hundred and fifty dollars the monthly fee which Adjustment Service paid for the use of an attorney's name on a certain form letter which Adjustment Service sent, on occasion, to debtors from whom Adjustment Service was undertaking to collect a debt owed to a creditor. In most cases the creditor was a doctor or a hospital.

Prior to taking office as judge, defendant had practiced law in partnership with his brother, Reynolds Alonzo. The fee of $100 per month for the letter had been paid to the partnership. The contention of the state is that in December, 1966, or January, 1967, defendant, prior to taking office as judge, conceived the idea of using the power of his office to force Adjustment Service to raise the monthly fee as above stated. The state contends that defendant discussed the matter with Stokes over the telephone and told Stokes that by withholding or denying judgments for plaintiffs in suits brought by or at the instance of Adjustment Service, defendant would force Adjustment Service to raise the fee for the letter to $350.00 per month. Stokes testified that he obtained and attached to his telephone a tape recording device and, unbeknownst to defendant, made recordings of conversations with him.

The state further contends that after defendant took office in January, 1967, he, as judge, denied judgments for plaintiffs in certain suits in which Adjustment Service was seeking to make collections; that Adjustment Service paid the additional $250.00 fee to defendant's brother for the month of February; that defendant then rendered judgments for plaintiffs in the suits in which judgments had been denied previously; and that Adjustment Service paid the fee of $350.00 also for the month of March.

Defendant filed a motion to suppress the tapes and also a motion to require plaintiff to produce the tapes and allow defendant to have the tapes examined by an expert or experts to determine whether the recordings had been altered. Defendant's motions were denied and the tapes were admitted into evidence over defendant's objections.

Defendant argues that the court erred in overruling his motion to suppress because the tape recordings were not admissible against him for that they had been obtained by electronic eavesdropping which was an invasion of defendant's privacy prohibited by Section 5 of the Constitution of 1901 and the Constitution of the United States. Defendant cites Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, and Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040.

The conversations in *Katz* and *Berger* had been recorded without the consent of either party to the conversation. In the instant case, the conversations had been recorded by one of the two parties to the conversation. Certainly it would not be an invasion of privacy for Stokes to recall and repeat from memory what defendant had said to Stokes.

It has been said, in connection with 47 U.S.C. § 605, that:

"The clear inference is that one entitled to receive the communication may use it for his own benefit or have another use it for him. The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone. It has been conceded by those who believe the conduct here violates Section 605 that either party may record the conversation and publish it. . . . ." Rathbun v. United States, 355 U.S. 107, 110, 78 S.Ct. 161, 163, 2 L.Ed.2d 134.

In a bribery prosecution, where the court held admissible a wire recording of a conversation made on a pocket recording device carried by an agent of the government while talking to defendant, the court said:

" . . . . Indeed this case involves no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself.
" . . . . . . . . .

"Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an

accurate version of a conversation that the agent could testify to from memory.[11]

We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.

"11. The trustworthiness of the recording is not challenged."

" . . . . . . . . ."
Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462, 470, 471.

We are of opinion that the tape recordings in the instant case were not inadmissible on the ground that they were obtained by an unauthorized invasion of defendant's constitutionally protected right to privacy.

On authority of *Rathbun,* the tapes were not inadmissible on the ground that they had been obtained by violation of 47 U.S.C. § 605.

Defendant contends that the tapes were inadmissible because they were obtained by a recording device which violated Federal Communications Commission Regulation No. 132, effective October 9, 1964, which requires that connection of customer-provided voice recording equipment with a telephone shall be made only through connector equipment which contains a tone device automatically producing a distinctive recorder tone that is repeated at fifteen second intervals when the recording equipment is in use. The recording equipment used by Stokes had no such tone device.

The purpose of Regulation No. 132 appears to be to warn the telephone user that his conversation is being recorded. The failure to so warn, however, does not cast doubt on the truthfulness of the speaker's conversation or the accuracy of the recording and the regulation can hardly be said to give rise to a constitutional right. The tapes were not inadmissible on the ground that Stokes violated Regulation No. 132.

The court did not err in overruling defendant's objections to admission of the tapes on any grounds thus far discussed. There remains, however, the overruling of defendant's motion to have the tapes inspected by a qualified expert.

After the court denied defendant's motion for continuance, he next called to attention of the court his motion to suppress the tapes. The prosecutor stated:

"MR. MARSAL: The Motion is premature in that there's nothing before the . Court to proceed on in the way of evidence to be suppressed. The record is void of such. Now, at the time of the proceedings, if there is evidence that is subjected to a Motion to Suppress, or objected to, then the Court at that time, as I understand the proceeding, will have the opportunity to determine its admissibility."

Defendant referred to Brown v. State, 277 Ala. 108, 167 So.2d 291, and counsel for defendant stated, among other things:

". . . . Now here we have a fourth amendment situation and the defendant comes in on a Motion to Suppress and wants the Motion heard now, not during the trial. Now it's quite true that under the Brown case it could possibly be heard during trial, but we're not asking the Court to hear it later. We want it heard now and the issue determined now, not later, concerning this whether or not this evidence is to suppressed. . . . ."

Later, in colloquy on the motion, the following appears:

"THE COURT: Well I'm going to defer passing on your Motion until we come to it, then—

"MR. HAAS: Well—

"THE COURT: —offer in evidence—

"MR. HAAS: —to make the record clear, defendant asks that the Motion to Suppress that has been filed be heard before any further proceedings transpire in the case.

"THE COURT: All right, request denied."

In *Brown*, this court said:

"We do not hold that a pretrial motion to suppress is improper . . . ." (277 Ala. at page 111, 167 So.2d at page 294)

Accordingly, defendant's motion to suppress was not premature.

Defendant next called to the court's attention his motion to produce the tapes so that defendant might have them examined by a qualified expert.

In the ensuing colloquy the following appears:

"MR. MARSAL: All right sir, Mr. Haas says in the presentation of the tapes, we expect to put the people on the stand that heard the conversation, knows the conversation, knows the recording machine, knows its operation, and we have that burden before it's admitted in evidence. In the other cases that the Supreme Court of our State has ruled on, the Court has never at any such time permitted or acquiesced in any such thing as to having the tapes examined before trial. At the time of the trial is the time we make our presentation, is the time for the examination to be made and it's before the court, not before the Jury. The Procedure says that the tape must be played before the Court, outside the presence of the Jury.

"THE COURT: Yes, sir, I'm familiar with that.

"MR. MARSAL: And that's when I'll have to do it just like a confession.

". . . . . . . . . .

"THE COURT: Frankly I think the Motion has some merit, but I don't know how to handle it to be perfectly honest with you. I don't know who the local experts are.

"MR. HAAS: Judge, I can find one on our behalf and he can submit his and both

of them can look at them under Court's supervision. I'll get one.

"THE COURT: All right.

"MR. HAAS: I guess we got them, Mobile's a big city.

"MR. MARSAL: Judge, in case of Judge Harwood's opinion[1] he says this, and he lays out the procedure: (Reading) The recording shall be played out of the presence of the Jury to give the other party an opportunity to make objections. A transcription should be made at the same time. And he puts out if anything is inadmissible about it, then the Court is the one to make the decision at that time as to what part of the tape is inadmissible and what part is. The parties who were present when recordings were made are available and testify, as to the audible sounds, parts of the transcription. And that is the proceeding that the Supreme Court has already held to be in order. Now Mr. Haas comes in here with a foreign substance that we've never heard of, a motion to produce these things and we submit to the Court that that's not the procedure that our Court has set down. At the time there's a voir*e* dire, he has the right to take the witness on voir*e* dire and out of the presence of the Jury.

"MR. HAAS: That will be too late, Judge. I'm not an expert. I can't wait until then. The Court adequately understands it and I'll go along with the Court's ruling.

"MR. MARSAL: Judge, we have to prove everything beforehand before they're admissible the burden is on us for laying the predicate, which we intend to do and if we don't lay the predicate I'm sure the Court will make a proper ruling.

"THE COURT: It strikes me that it doesn't give him the opportunity to rebut it, Mr. Marsal. I think he should be entitled in advance to prepare to meet that:

" . . . . . . . . . . .

"THE COURT: I grant the Motion. Let's go in chambers and see if we can work out something. The Court will recess until 1:30.

"THE COURT: He says Mr. Worthy couldn't be here until two o'clock."

At 2:00 o'clock, defendant's expert, Worthy, took the witness stand. He testified that he had been in the electronics business since 1939; that he was first trained by an amateur radio operator; that he attended Capitol Radio Engineering in Washington, D. C., for 400 hours in 1945; that he attended the Coast Guard Institute for 27 weeks in 1946 taking courses in advanced electronics; that afterwards he worked in the field of electronics; in 1953 he was employed by Philco Corporation as field engineer assigned to the Air Force; since August 1962 he has been in business for himself; that he is experienced in tape recordings; that "We used the telephone system in the Air Force for recording . . . . We used tape recordings for air traffic control . . . . "; that he had worked with tape and tape recordings; that he is a qualified video tape recorder repairman; that he is familiar with techniques which can be used to alter and change recordings by splicing, dubbing, or whatever you can do; that "I think most anybody can do this. It's a very amateurish practice."

Worthy testified further that when a tape has been spliced you can look at it and tell, but a copy can be made with no visible evidence. He testified:

"Q. You can look at the original and tell, but what about the other techniques, dubbing, modulation, sound control and other ways?

"A. You could take this same tape and although—take the noise levels and make a study of them and determine whether or not it had been spliced. A tape can be dubbed, you can take the

---

1. Apparently refers to Wright v. State, 38 Ala.App. 64, 73, 79 So.2d 66.

original tape that had been spliced and you can re-record it on another tape and there will be no visible indication, you have no way to test it to determine whether it was the original or not."

Stokes and Armstrong testified that they had made the tape recordings, that the tapes had never been out of their possession and were the original tapes they had recorded.

Apparently some questions were next addressed to Worthy as follows:

"MR. MARSAL: Would it be in order to ask the gentleman to see the tapes?

"THE COURT: I think so.

"MR. WORTHY: I'd like to make a motion in order to study these tapes. It would take some time.

"THE COURT: How much time will it take?

"MR. WORTHY: There's no visible way; I don't know whether or not— you say these are the original tapes but I don't know whether they are or not. I'd like to examine these tapes under intricate electronic device to see whether they are or not."

Nervine, a witness for the state, testified that he was owner of Electronics World, at 2204 Government Street; that he was involved in the making of tapes and arranging for the manufacture of tapes; that he had been handling tape recorders physically for 18 years and in manufacturing tapes and in the sale of tapes and recording equipment for 4 years; that he had no formal education in this field.

Hale, a witness for the state, testified that he is a machine repairman and has been so engaged for 3 years; a portion of his employment is devoted to tape recording machines; that he is familiar with the mechanics of tape recording; he has worked wtih tapes and tape recorders since he has been with his present employer;

he is twenty-three years old and was in the Army as an electrical technician before his present employment; that he has not had training in actually changing tapes; he knows some but not all of the techniques which could be used to change tapes; that a simple alteration like splicing a tape is detectible with the naked eye but other kinds of alteration "would necessarily be electronic."

At this point, apparently, the expert witnesses were permitted to make a visual examination of the tapes in question. Then or later the experts were permitted to hear the tapes played.

Defendant then requested the court to allow the expert opportunity to conduct tests on electronic machines to determine whether the tapes had been altered by splicing or other methods, but the court denied the request as follows:

"MR. HAAS: May it please the Court, it was my understanding, I believe I'm correct, that the Court had granted Defendant's motion to produce these tape recordings for them to be examined by an expert or experts. Mr. Worthy, who was the expert that we brought in today tells me that he has completed, more or less, the physical examination of the tapes with his eyes only, with no optical and no audial aids and as far as he can tell from a physical examination of the tapes by looking and geeling, there are no splices in the tapes that are here. I submit to the Court from my discussion with Mr. Worthy, this does not end the matter. No responsible—Mr. Worthy tells me as an expert on the subject that only an idiot would bring to Court as evidence spliced tapes. No one would do that. That would be silly, knowing that they were going to be examined. It would be ridiculous to bring them to Court. He tells me there are many many methods that can be used other than splicing to alter or change the tapes and that in order for him to determine those, whether any of those have been used, he needs to have the tapes run

through a certain device, kind of machine —I think he called it an oscilloscope— and other things. And he can then tell with almost certainty, not complete certainty, but with a lot more certainty, whether or not there has been any dubbing or other types of audial changes in the tapes. Now this would amount to such things as having spliced, dubbed down, somethin*k* like that, re-recorded or having recorded a little here and a little there, and added together things of that sort. He can't do that by looking at them. Another thing he needs to do in regard to the oral content, in order for it to be completed, he would have to play it for sound quality, put it on the machine and listen audiowise. He tells me what he has done not only convinces him what he knew before. He stated no one would bring spliced tapes in here to be examined. It would be idiotic, that only a child could feel splices in the tape. In fact he says it's not even necessary to be an expert to figure that out, with good eyes and fingers that you can see and *g*eel something wrong. I understand the Court granted the motion to give the man the opportunity to conduct these tests and I ask that he be given the opportunity to conduct further tests to make sure.

"THE COURT: Mr. Haas, I have to deny that request. I'll give you an exception. We must move along. We've been here two days and now we must move along."

The following statement appears in 17 Am.Jur. Proof of Facts, pages 20 and 21, to wit:

"§ 23. Examination of Questioned Tape Recording

"In many cases a full audio laboratory examination may be unnecessary to detect an altered tape; a crudely edited tape is almost invariably apparent as such. When attempting to determine by ear if there is any alteration of a tape, particular attention is paid to any change in volume, content, or continuity in both the speaker and in the background sounds. The pacing of the speaker is followed for irregularities in tempo. Sudden or peculiar extraneous sounds are noted. If a multiple track tape is being examined, all of the tracks are played in full and checked for. irregularities.

"A thorough examination of a questioned tape entails an analysis by a sound laboratory equipped with microscopic, spectroscopic, oscillographic, and other electronic equipment capable of detecting inconsistencies or alterations inaudible to the human ear.

" . . . . . . . . .

"§ 24. Expert Examiners

"Highly qualified specialists in the field of tape editing may be found on the staffs of manufacturers of tape recording equipment and in the studios and laboratories of commercial recorders, motion-picture production companies, and radio and television stations. Men who are less highly specialized and less skilled but still knowledgeable on the subject may be found in almost any community large enough to have a radio station or a small recording studio."

The foregoing matters, as we understand the record, took place outside the presence of the veniremen, and prior to selection of the jury which next occured.

Stokes was called as a witness for the state. He testified at length. In his testimony he stated what defendant had said in conversations with the witness. Some of the conversations were face to face, some by telephone.

The tapes of certain recorded phone conversations were offered in evidence. Stokes testified that there had been no changes, additions, or deletions in the tapes. The tapes were admitted into evidence over defendant's objection and played in the presence of the jury.

Defendant's expert, Worthy, was called to the witness stand. He testified that he

had listened to the tapes; that there was evidence in two particular spots to indicate that the tapes had been altered. He testified:

"A. Exhibit Number Five had background music and it would give some possibility of this tape being recorded on another machine, or the machine that was being used to record the tape possibly being at fault in not erasing properly.

"In Exhibit Number 7 there was a drastic change in volume level which could indicate that the tapes had been tampered with or that the tapes were defective in some way. I could not determine exactly any tampering on these tapes unless I was given the opportunity to make an electronic check of the tapes.

"Q. Mr. Worthy, you say Exhibit Number 5 that there was some background noise, music that seemed to have been played at a different speed than those other tapes?

"A. Seemed to have been recorded at a faster speed than this machine was playing it back.

"  .   .   .   .   .   .   .   .   .

"Q. Isn't it a common practice to use background sound such as music and things like that to cover up any splicing or dubbing that might be done to the tape?

"A. It's possible.

"Q. All right sir, is there any way that you can determine, other than just listening to them to determine whether or not these tapes have been altered in any way?

"A. There's a strong possibility that if tested with the proper electronic equipment you could detect flips and pops and patches.

"Q. All right sir, what kind of equipment is that?

"A. Well it would require an oscilloscope, level meters, voltage level meters and so forth.

"Q. Do you have that, such equipment available to you?

"A. Yes sir.

"  .   .   .   .   .   .   .   .   .

"Q. Using this technique in splicing and dubbing and cross-phase, all the various techniques that are used in altering tapes, would be possible to take two entirely spearate conversations and two entirely different times and places and put them together in sequences to make it appear that the flow of the conversation with the sentences re-arranged and altered?

"A. Yes sir, it is possible.

"Q. Would it sound and appear as if the tape was done all at one time?

"A. If properly done it could be so.

"Q. All right sir, if these things had been done to a tape, could you detect it by just merely listening at it or listening to it or looking at it?

"A. Only if it was a very sloppy job.

"Q. In other words if it was done with any degree of skill you would not be able to determine by listening to it or looking at it?

"A. No sir.

"Q. I see. What would be necessary for you to determine if a tape had been spliced, dubbed, cross phased or any other way tampered with?

"A. Well, a complete electronic check may bring out the fact that it had been. Now it's not a guarantee that it will.

"Q. You have these things, this electronic equipment available to you, do you not?

"A. Yes sir, I have the equipment.

"Q. If it please the Court, Judge at this time we would move to be allowed under Court's supervision to have Mr. Worthy perform these electronic tests on these tapes as he has indicated were necessary

to determine whether or not they have been in any way tampered with."

The court denied defendant's motion. The state's expert, Hale, testified:

"Q. Have you ever spliced a tape in order to alter what was recorded on it?

"A. No, sir.

"Q. You haven't?

"A. No, sir.

"Q. Like splicing it so that it might leave out a word so that a statement on a tape for instance it would read: I did not leave any of the buildings that night, would read: I did leave the building that night?

"A. No, sir.

"Q. All you have to do is splice out the not, is that right?

"A. Yes sir.

"Q. And you not only can splice out, you can splice in, can't you?

"A. Yes sir.

"Q. You can dub things in as it's called when you splice something in, it's called dubbing, is it not?

"A. Yes sir.

"Q. And these techniques are relatively simple, are they not?

"A. Yes sir.

"Q. Anyone that's familiar with the operation of the machine can do these things, can't they?

"A. Yes sir.

"Q. And once you have done it and re-recorded the tapes that you've done it on, you can't find a splice with the naked eye or with your hands can you?

"A. By looking at it, no sir.

"Q. No sir. You have to use delicate electronic instruments to determine that don't you?

"A. I would think so."

The following appears in the testimony of defendant's expert Worthy on his being recalled, to wit:

"Q. Well for whatever reason, Mr. Worthy, you haven't had a chance to subject these tapes to a fair scientific test, have you?

"A. No, sir.

"Q. And even with your ear you suspect some alterations, is that what you said?

"A. Yes sir."

The defendant testified that he had met Stokes in late 1961 or early 1962, that "We were very close friends. At least I thought we were."; that Stokes was one of defendant's strongest supporters in his campaign for judge; that "I think that Ben was the one first suggested me to run for this job"; that Stokes solicited funds from various people to raise money for defendant's campaign and contributed personally. Defendant testified:

"A. Ben gave me some funds for newspaper or television or something and he told me that money came from Mobile Adjustment but he gave me the money. He either gave me the money, I don't really know how he gave me the money, but I know that I didn't get it direct from Mobile Adjustment, I know that."

Defendant testified further that in November or December, 1966, defendant saw Stokes and he was disturbed or did not look too cheerful. Defendant asked " 'What's the matter?' " and Stokes said that he had lost Mobile Adjustment and " 'Well they want to cut my fee arrangement.' " During further conversation, defendant told Stokes that defendant would do anything he could to make them keep Stokes' fee where it was; that, at a later time, Stokes told defendant everything had worked out fine and Stokes and Adjust-

ment were back together again. Defendant testified:

"Q. All right, now is it true or not true that you tried to get the fee for the law letter for the services performed in trying to collect these accounts before suit for Mobile Adjustment, is it true or not true that you tried to get that fee raised for your brother?

"A. Absolutely true. I tried to get it raised for myself before I became Judge also.

"  . . . . . . . . . .

"Q. What efforts were made prior to your becoming judge to get the fee raised?

"  . . . . . . . . . .

"A. We told him that the work was increasing and we wanted more money for sending out the letter. Reynolds went to see—"

Defendant testified that he had talks with Stokes many times about defendants' desire to have the fee raised; that defendant had numerous telephone conversations with Stokes and "saw him almost, not every day but very frequently."

Defendant denied that he had told Stokes that defendant was going to make it tough on Mobile Adjustment as judge if he did not raise the fee for Alonzo and Alonzo. Defendant testified:

"Q. You did not?

"A. I did not.

"Q. Now you heard these so called tapes in here that they have played? Do those accurately reflect as best you can recall, any actual conversations?

"A. Parts of those tapes I have no way of knowing what conversations were we had. I know what the subject matter was about. They were parts of those tapes that might have been true conversation between Ben and I, but most

of them were mixed all together between various subjects that we discussed.

"  . . . . . . . . . .

"Q. Do you recognize that, Judge Alonzo?

"A. Sounds like my voice.

"Q. Was that taken out of context?

"A. Most certainly was. Again I state we had a series of three different types conversations .over this period of time with Ben. There's a conversation dealing with the fact that Mobile Adjustment had quit him and was going to cut his fee fom twenty-five to twenty percent, and I told him I'd help him any way that I could, that I never did like them anyway. We had a series of conversations, numerous conversations concerning the fact that I thought that Reynolds should raise his retainer fee, and discussed that numerous times. He even told me his feelings on they wouldn't want to pay Reynolds any more fee except they might cut his fee, etc., and we had a third topic of conversation about the changes I made in Court and I also know this that if Mr. Stokes only had six conversations with me from the date that he says was sometime in January until the end of February, I know, I'm positive of this, I know we had to talk about more than just business but I never once talked to Stokes in all the years that I've known him on the telephone that we didn't discuss matters other than business because we always talked about sporting events and other things and that's why I'm positive these tapes have been changed and altered because there was never any conversation on anything except business."

In summary, defendant's testimony is to effect that he had had many telephone conversations with Stokes during the months of December, 1966, and January, February, March, 1967; that these conversations related to three general topics; that, habitually, during the course of their

conversations, they discussed also, in addition to business, sporting events and other things, which had been left out of the tapes introduced into evidence; that the tapes had been altered and did not truly and correctly record the conversations between Stokes and defendant; and that defendant had not used or threatened to use his office as judge to compel Mobile Adjustment Service to raise the monthly fee paid for the letter.

The Court of Appeals has said:

"The controlling question in all criminal prosecutions is the guilt or innocence of the person accused. But, however guilty the defendant may appear to be from the evidence, he is nevertheless entitled to a fair and impartial trial, and before a judgment of conviction can be permitted to stand, upon appeal, it must affirmatively appear that the trial below proceeded throughout without prejudicial and substantial error." Taylor v. State, 22 Ala.App. 428, 429, 116 So. 415, 416.

This court has said:

"The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. . . . ." Watts v. State, 282 Ala. 245, 248, 210 So. 2d 805, 808.

The question here presented for decision appears to be a novel one on which there is little, if any, authority. The question is whether the court erred in denying defendant's request to have the tapes examined by electronic experts to ascertain whether the tapes had been altered or changed.

It must be conceded that a tape recording may be altered so that the meaning of the altered recording is different from the meaning of the original words spoken. In 17 Am.Jur. Proof of Facts, pages 13 and 14, appears an example where the uncut taped statement, "I DIDN'T LEAVE ANY OF THE BUILDINGS THAT NIGHT," may be changed to the statement, "I DID LEAVE THE BUILDING THAT NIGHT." In the last cited text at pages 14 and 15, it is stated:

" . . . . Most professional splicing accessories trim the edges of the tape slightly, but if the splicing device is properly adjusted, the amount of tape trimmed is so small that the resulting loss of volume is inaudible. Such trimming may, however, reveal the location of splices when a questioned tape is analyzed with highly sensitive equipment developed for the purpose."

The testimony of the expert witnesses in the instant case supports the assertion that changes in a tape, which are not visible to the eye and are not audible when the tape is played, may be detected by proper electronic equipment.

A statement of what must be shown before a recording can be admitted is as follows:

" . . . . A proper foundation for their use must be laid as follows: (1) It must be shown that the mechanical transcription device was capable of taking testimony. (2) It must be shown that the operator of the device was competent to operate the device. (3) The authenticity and correctness of the recording must be established. (4) It must be shown that changes, additions, or deletions have not been made. (5) The manner of preservation of the record must be shown. (6) Speakers must be identified. (7) It must be shown that the testimony elicited was freely and voluntarily made, without any kind of duress." Steve M. Solomon, Jr., Inc. v. Edgar, 92 Ga.App. 207, 88 S.E.2d 167, 171.

The foregoing statement appears to have been generally accepted as a correct statement of the law.

In considering the admissibility of a wire recording of a confession, the Oklahoma Criminal Court of Appeals said:

" . . . . The genuineness or the authenticity of the recording must be established. The contention of counsel that the recording should have been rejected because the evidence disclosed that the wire may be erased or otherwise changed likewise applies to a confession which is taken by a court reporter in shorthand and later transcribed. The rules as to the authenticity or genuineness of the confession are the same. If the party objecting to the confession can make a showing that it has been erased or deleted or changed in any manner the court would sustain an objection to its admissibility. . . . . "
Williams v. State, 93 Okl.Cir. 260, 270, 226 P.2d 989, 995.

None of the cases cited has to do with expert examination of a recording with electronic instruments to determine whether the recording has been altered. One court has referred to a recording as a mechanical witness, saying:

" . . . . In the case at bar, the fact that the recording is a mechanical rather than a human witness should not render the evidence incompetent provided there is proper foundation for its admission." Belfield v. Coop, 8 Ill.2d 293, 134 N.E.2d 249, 255, 58 A.L.R.2d 1008, 1019.

If it be conceded that objection to the recording would be sustained if the objecting party can show that it has been altered; Williams v. State, Okl.Cr., supra; what is the extent of the objector's right to examine the recording to show that it has been altered? The party cannot cross-examine a tape recording. Visual inspection and hearing the recording played will not adequately reveal splicing, dubbing, and other changes in re-recorded tape which has been altered. If restricted to visual inspection and hearing the tape played, the objector is limited to inadequate means of sustaining the burden placed upon him.

As quoted above, the trial court appears to have recognized that denying defendant opportunity to examine the tapes before they are offered in evidence "doesn't give him the opportunity to rebut it . . . he should be entitled in advance to prepare to meet that." Perhaps for this reason, the court permitted defendant's expert to make visual examination of the tapes and to hear them played. It can hardly be maintained that the trial would be fair if defendant were denied the right to make advance examination of the tape by eye and ear to detect and point out splicing which can be detected by such examination. If defendant is entitled to make such examination, why is he not entitled also to make scientific examination using electronic machines to detect alterations which are not otherwise discoverable?

Stokes testified that the tapes in the instant case had not been altered and defendant testified to the contrary. The testimony of both cannot be true. Electronic examination of the tapes may reveal who spoke the truth. In the search for truth, the court should avail itself of all practical means to ascertain the truth. The means proposed, an electronic examination of the tapes, were available and, according to the expert testimony, appear to have been practical. Denying defendant's request for such examination was prejudicial and substantial error.

There is one decision which bears some analogy to this question. In a prosecution for possession of bookmaking records, certain slips of paper were introduced into evidence against the defendant. The appellate court reversed for admitting the slips into evidence over defendant's objection that they had been seized and taken from him by an unreasonable search and seizure in violation of his rights under the Fourth Amendment of the United States Constitution. With respect to the slips the court said further:

"The observation may be here pertinent that the trial record reveals that the exhibits received in evidence against Koenig were not in the same condition as they were when taken from Koenig.

There was an assertion that something had thereafter been added to the exhibits—something that had not appeared originally. Counsel sought an opportunity to prove by a qualified expert that the addition was made at a later time. For the purpose of obtaining such proof the defense sought an adjournment. The trial judge denied the request and directed the trial to proceed. In the view that we have taken of this case, it is unnecessary to stress this point further, other than to mention that it appears that the interests of justice dictated that the proffered proof be adduced and that a denial of an adjournment for the reasons stated and under the circumstances disclosed were an improvident abuse of discretion. (Citations omitted)" People v. Koenig, 34 Misc.2d 711, 228 N.Y.S.2d 1012, 1015.

In the instant case, the interests of justice dictated that the proffered proof of alteration of the recordings be adduced. Denial of the opportunity to obtain and produce the proof requires reversal.

LAWSON and SIMPSON, JJ., concur.

### ON REHEARING.

BLOODWORTH, Justice.

We have considered each ground submitted by counsel for appellant on application for rehearing.

We see no useful purpose to be served in writing to each point raised except to answer the contention that Title 13, § 7, Code of Alabama 1940, as last amended, precludes the author of the majority opinion from delivering the opinion of the court because he was not a member of the court on November 14, 1968, when this cause was argued orally.

The fact is that this Justice assumed office the next day, November 15, 1968, and did not hear the case argued orally before a division of this court consisting of Chief Justice Livingston, Justice Coleman, Justice Harwood (sitting for Justice Simpson), and Justice Kohn, the latter the predecessor of this Justice.

This same contention has been heretofore raised before this court and decided adversely to the appellant first, in 1909 in the case of Alabama Western Railroad Co. v. Talley-Bates Const. Co., 162 Ala. 396, 50 So. 341, and more recently, in 1963 in the case of Nelson v. Darling Shop of Birmingham, Inc., 275 Ala. 598, 157 So.2d 23.

We pointed out in Nelson v. Darling Shop of Birmingham, Inc., supra, that as a matter of policy this court has, through the years, attempted to follow the provisions of this statute. However, as we said in Alabama Western Railroad Co. v. Talley-Bates Const. Co., supra, viz:

"* * * Without conceding the power of the Legislature to control this court in the discharge of its constitutional duty to render decisions in causes brought here—for *it appears to us to be doubtful, to say the least, whether the Legislature* has any such power * * *." [Emphasis supplied]

By way of observation we note that two of the four Justices who heard the oral argument joined in the majority opinion, and of the other two, one · is Justice KOHN, this writer's predecessor in office, and the other is Justice COLEMAN, to whom the case was originally assigned, and who wrote the dissenting opinion.

To conclude, we reiterate that we shall, as a matter of policy, attempt to follow the statute insofar as practicable and when it does not conflict with the internal operating procedures of this court.

Application for rehearing overruled. Application for reargument denied.

LIVINGSTON, C. J., and MERRILL and HARWOOD, JJ., concur.

COLEMAN, Justice (On Rehearing):

I would not grant the rehearing on the ground that the majority opinion was written by Mr. Justice BLOODWORTH.

As to the merits, I adhere to my views expressed on original deliverance.

LAWSON and SIMPSON, JJ., concur.